NATIONAL BANK OF CHESTER v. ATLANTA & CHARLOTTE AIR LINE RAILWAY COMPANY.

1. A railroad company chartered by the State does not, by leasing its road to another corporation, release itself from liability for goods received by its line for carriage and not delivered. The lessor continues to be liable for all acts done by the lessee in operating the road, whether the cause of action be *ex delicto* or *ex contractu.*

2. A bill of lading is so far negotiable as to pass to its endorsee all the right to the possession of the goods therein mentioned. And while the goods may be delivered without the production of the bill of lading, the carrier thereby assumes the burden of showing that the delivery was to the proper person. *Cases reviewed.*

3. Where time drafts, accompanied by indorsed bills of lading of cotton, were cashed by a bank, any arrangement between the drawee of the drafts and the shipper, unknown to the bank, that the cotton should be delivered to the drawee without the production of the bills of lading, would be a fraud on the bank, and would not excuse an improper delivery by the carrier to such drawee.

4. A bill of lading drawn to the order of the consignor with the added words, "Notify L. M. Co.," did not require a bank receiving such bill of lading by proper indorsement for value, to notify the carrier not to deliver to the L. M. Co., nor to inquire whether the goods would be so delivered.

5. The Circuit Judge properly refused to charge the jury "that if the jury find that the L. M. Co. was entitled, by its contract, to the cotton, upon its acceptance of the drafts, then the plaintiff cannot recover, even

though it still holds the bills of lading"—for by so charging he would · have submitted to them a question of law.

6. The judge did not err in refusing to charge that the railroad company was entitled to timely notice of the non-payment of the drafts, otherwise the bank was not entitled to recover; because (1) the railroad company could fully protect itself by complying with its contract made before the drafts were drawn, and the wrongful delivery was made without any knowledge of the existence of the drafts; (2) the delivery was made before the maturity of the drafts; and (3) notice was given within reasonable time after the non-payment.

Before WALLACE, J., York, April, 1885.

The opinion fully states the case.

*Mr. C. E. Spencer*, for appellant.

I. Whilst the railroad has a right to demand a bill of lading before delivery, its production is not necessary. Surely, the plaintiff has in no sense been damaged here, if the R. & D. R. R. Co. delivered to the party entitled to receive. The simple point contended for here is that the bailee is not estopped by his receipt, but that delivery to the party having the right of possession is a sufficient defence against the claim of the bailor. 93 *U. S.*, 575. The instructions to the jury upon this point were calculated to mislead. II. The plaintiff took subject to the right of the L. M. Co. to the cotton (whatsoever that was) as against McCauley & Co. 1. This is true, even if plaintiff did not know of any right. A bill of lading is neither a negotiable promissory note, nor a bill of exchange. *Code*, § 133. 2. At best, it is only *quasi* negotiable. 2 *Pars. Cont.*, 289; 55 *Am. Dec.*, 290, 370. 3. But plaintiff knew, or was put upon inquiry, so it cannot plead a transfer in good faith, even if the bill otherwise falls under the exception in section 133 of the Code. III. There was evidence that, as between McCauley & Co. and L. M. Co., the latter was to get the cotton upon acceptance of the drafts. This evidence admissible. 1 *Greenl. Evid.*, 225. McLure knew in June that the cotton had been delivered to L. M. Co., and proved debt against L. M. Co. afterwards. IV. The defendant was entitled to timely notice that the drafts were not paid, and that it would be held

responsible.    V. There was no right of action against the defendant, if the R. & D. R. R. Co. was operating defendant's road at the time.    The general doctrine is conceded that a railroad corporation cannot escape the performance of any duty imposed by its charter, by a voluntary surrender of its road into the hands of lessees.    17 *Wall.*, 445.    It is quite plain, therefore, that for all matters *ex delicto*, done or suffered by the lessee, the lessor is responsible.    The practice is equally well settled that the lessee is liable to the same extent as the lessor would have been, while it continues to operate the road.    29 *Vt.*, 421 (70 *A. D.*, 426). The question was at first left open, however, as to the right to sue the lessor, when the cause of action was bottomed upon a special contract made with the lessee.    36 *Am. Rep.*, 574.    But it seems now that the recognized practice is to sue the lessee alone in such cases, especially where by its charter the lessor has the right to lease.    *Rorer R. R.*, 604, 605, note 5, 606–609; 10 *Gray.* 104.    The charter to the defendant conferred upon it the right to farm out its road.    12 *Stat.*, 440, § 4;    11 *Stat.*, 348, § 13.    "To farm out" is broad enough to cover a lease.    72 *N. C.*, 637;    73 *Id.*, 528.

*Messrs. J. & J. Hemphill*, and *Brawley & Barnwell*, contra.

July 12, 1886.    The opinion of the court was delivered by

MR. JUSTICE MCIVER.    This was an action brought by the plaintiff against the defendant, a common carrier, for damages for the non-delivery of two lots of cotton delivered to it for transportation to the town of Lowell, in the State of North Carolina. It appears that by some arrangement between McCauley & Co., merchants, doing business in the town of Chester, South Carolina, and the Lawrence Manufacturing Company, carrying on their business of manufacturing cotton goods in the town of Lowell, North Carolina, McCauley & Co. bought cotton and shipped it to the manufacturing company, drawing time drafts on said company for the price of said cotton, which drafts were discounted by the plaintiff bank as soon as they were drawn, whereby the said McCauley & Co. were placed in funds to pay for the cotton.

When the two lots of cotton in question were bought by McCauley & Co. and shipped, they received from the Chester & Lenoir Narrow Gauge Railroad Company bills of lading of the following tenor: ' Received of D. McCauley & Co. the following packages in apparent good order, contents and value unknown, to be transported in like good order unto order, notify Lawrence Manufacturing at Lowell,'' &c. The remainder of the bill of lading being immaterial to the present inquiry. When the cotton reached Gastonia, it was delivered to the Atlanta & Charlotte Air Line Railroad Company, as appears by the receipt of its agent at that point, and was by the last named company, or rather by its lessee, the Richmond & Danville Railroad Company, transported to Lowell, where it was delivered to the Lawrence Manufacturing Company without the production of the bills of lading, or any order from the said D. McCauley & Co. When the drafts drawn by McCauley & Co. against this cotton were discounted by the plaintiff bank, they had attached to them the bills of lading, endorsed in blank by McCauley & Co., and the drafts, detached from the bills of lading which were retained by the bank, were promptly forwarded for acceptance to the maufacturing company, duly accepted, and returned to the bank. When the drafts matured they were not paid, except a small part of one of them, the manufacturing company having in the meantime failed. Soon afterwards demand was made upon the railroad company by the bank for the cotton, which not being complied with, this action was commenced.

The defendant undertook to show that though the bills of lading were drawn to the order of McCauley & Co., yet that the understanding was that the cotton was to be delivered to the Lawrence Manufacturing Company so soon as the drafts drawn against it were accepted by that company; but there was no evidence showing that the bank was a party to, or even knew of, such an arrangement. Indeed, it would seem that such an arrangement, if known to and acquiesced in by the bank, would render the security afforded by the transfer to it of the bills of lading wholly worthless, and is altogether irreconcilable with the conceded fact that the bank retained the bills of lading when the drafts were sent forward for acceptance; for if the bank had

understood that the Lowell Manufacturing Company was to be entitled to receive the cotton when the drafts were *accepted*, and not when they were *paid*, then, according to the usual course, the bills of lading would have been sent along with the drafts when they were forwarded for acceptance. On the other hand, it would be somewhat difficult to understand what advantage the manu-facturing company would gain by purchasing the cotton on time drafts, if it could not obtain possession of the cotton until the drafts drawn against it were paid, but for the fact appearing in the testimony that the president of the manufacturing company had been the railroad agent at Lowell, and had been in the habit of delivering cotton to the company without the production of bills of lading, which practice had been continued by the new agent, and therefore it was not supposed that there would be any difficulty about it.

The jury having found a verdict for the plaintiff, and judgment being entered thereon, the defendant appeals upon the following exceptions:

"First. For that his honor erred in charging the jury—

"1. That where goods are shipped, deliverable to the order of the consignor, the carrier cannot deliver them legally without the production of the bill of lading, properly endorsed.

"2. That a bill of lading is both a receipt for the goods shipped, and an express written contract for their transportation and delivery, and is so far a negotiable instrument that a transfer of it in good faith for value received is equivalent in law to the transfer of the goods themselves, it being a symbolic and constructive delivery of the goods, and in commercial transactions is regarded as a substitute for the actual, corporal transfer of the goods.

"3. That if the jury believe from the evidence that there was an understanding or agreement between the Lawrence Manufacturing Company and D. McCauley, or any other person, by which the cotton was to be delivered without the surrender of the bills of lading, such understanding or agreement was a fraud upon the rights of the bank, and the bank cannot be prejudiced thereby, unless such a mode of acting was brought to its knowledge and acquiesced in by it.

"Second. For that his honor erred in refusing to charge the jury as requested by the defendant—

"1. That if the jury believe that the contract between D. McCauley & Co. and the Lawrence Manufacturing Company was that the cotton was to be delivered upon its arrival at Lowell, and the acceptance of the time drafts, then the plaintiff who discounted these drafts cannot recover.

"2. That the plaintiff cannot recover if the jury find the further fact that the plaintiff knew, or might by due inquiry have found out, that the Lawrence Manufacturing Company was to get the cotton before payment of the drafts.

"3. That if the jury find that the Lawrence Manufacturing Company was entitled by its contract to the cotton, upon its acceptance of the drafts, then the plaintiff cannot recover, even though it still holds the bills of lading.

"4. That the defendant was entitled to timely notice that the drafts were not paid, and that it would be held responsible by the plaintiff; and unless the jury find that such notice was given, the plaintiff cannot recover.

"5. That the plaintiff cannot recover if the jury find that the defendant was not operating the railroad at the time of conversion."

As the last exception raises the question as to whether the proper party is sued in this action, we will consider it first; for unless the proper party is before the court, it would be fruitless to consider or determine the other questions as to the merits. The first question, then, to be determined is, whether the fact that the defendant company had, at the time the transaction here brought in question occurred, leased its road to the Richmond & Danville Railroad Company, which latter company was then operating the road, released the defendant company from liability in this case, leaving the Richmond & Danville Company solely liable.

When a railroad or other corporation receives its charter from the State, conferring certain franchises, rights, and privileges, it is upon the consideration that such corporation shall perform the duties and fulfil the obligations which it at the same time incurs. The fact that the corporation chooses to perform those duties and

fulfil its obligations to the community through another, whether as lessee or otherwise, cannot release it from the obligations which it has assumed by the acceptance of its charter. This doctrine has not only the support of reason, but is fully supported by the authorities. As is said by Mr. Justice Davis in *Railroad Company* v. *Brown*, 17 *Wall.*, 445: "It is the accepted doctrine in this country that a railroad corporation cannot escape the performance of any duty or obligation imposed by its charter or the general laws of the State by a voluntary surrender of its road into the hands of lessees." See, also, the *Y. & M. L. R. R. Co.* v. *Ross Winans*, 17 *How.*, 30; *Abbott* v. *J. G. & K. R. R. Co.*, 80 *N. Y.*, 27, reported also in 36 *Am. Rep.*, 572.

We are unable to appreciate the distinction attempted to be drawn by appellants' counsel between the liability of a railroad company which has leased its line to another, to actions *ex delicto* and actions *ex contractu.* The foundation of such liability is that such a company has, by accepting its charter, assumed obligations to the community from which it cannot absolve itself by leasing its road to another company; and as such a carrier is not only under an obligation to carry passengers safely, but also to deliver goods entrusted to it for transportation, we think the same principle which would make the lessor liable in the one case would also make it liable in the other. In this case, however, it appears that the defendant company, by its own agent, and not its lessee, receipted for the cotton, and hence the contract must be regarded as made directly with defendant company, though its road may at the time have been operated by the Richmond & Danville Railroad Company as its lessee.

Subdivisions 1 and 2 of the first exception involving, as they do, the true meaning and legal effect of a bill of lading drawn to order, may be considered together. That such a bill of lading, though not negotiable in the fullest sense of that term like a bill of exchange, or to speak more accurately, although its negotiability is not attended with *all* of the consequences resulting from the negotiability of a bill of exchange, yet that it is negotiable in so far that by endorsement the right to the possession of the goods mentioned in it passes, is well settled by repeated adjudications of courts of the highest authority, and is generally if not

universally conceded by the elementary writers. *Conard* v. *Atlantic Insurance Company*, 1 *Peters*, 386; *The Thames*, 14 *Wall.*, 98; *Dows* v. *National Exchange Bank*, 91 *U. S.*, 618; *Shaw* v. *Railroad Company*, 101 *Id.*, 557; and *Heiskell* v. *Farmers & Mechanics National Bank*, 89 *Penn. St.*, 155; *S. C.* 33 *Am. Rep.*, 745; *McCants* v. *Wells*, 4 *S. C.*, 381.

The case of "The Thames," *supra*, was very much like the case under consideration. There, one Gilbert Van Pelt, one of the members of the firm of Bennett, Van Pelt & Co., residing in Savannah, was in the habit of buying cotton and consigning it to his firm in New York. The cotton in question was paid for by the proceeds of drafts drawn by him on his firm in New York at fifteen days, which were discounted by the agent of an Atlanta bank, and the drafts were accompanied by bills of lading issued by the vessel to his order, and by him endorsed to the cashier of the bank. The drafts, with the bills of lading attached, were forwarded to the Fourth National Bank in New York for collection, and were duly accepted by Bennett, Van Pelt & Co. The vessel arrived in New York the day after the drafts were accepted and the cotton was immediately delivered to Bennett, Van Pelt & Co., who at once sold it for cash, and, before the drafts matured, failed. Thereupon the cashier of the bank filed his libel against the vessel, claiming damages for the non-delivery of the cotton according to the terms of the bill of lading, and the vessel was held liable.

Mr. Justice Strong, in delivering the opinion of the court, uses this language: "No argument is needed to show what is most manifest, that the delivery which was thus made was a breach of the ship's contract. By issuing bills of lading for the cotton, stipulating for a delivery to order, the ship became bound to deliver it to no one who had not the order of the shipper; and this obligation was disregarded instantly on the arrival of the ship, and it is no excuse for a delivery to the wrong persons that the endorsee of the bills of lading was unknown, if indeed he was, and that notice of the arrival of the cotton could not be given. Diligent inquiry for the consignee, at least, was a duty, and no inquiry was made, * * * and if after inquiry the consignee or the endorsees of a bill of lading for delivery to order cannot be

found, the duty of the carrier is to retain the goods until they are claimed, or to store them prudently for and on account of their owner. He may thus relieve himself from a carrier's responsibility. He has no right under any circumstances to deliver to a stranger."

This case and the others above cited, which are equally strong so far as the principle involved is concerned, fully sustains the correctness of those portions of the charge which we have been considering. It is true that a carrier may safely deliver goods entrusted to him for transportation to the person rightfully entitled to receive them, even without the production of the bill of lading, but in such a case he takes upon himself the burden of showing that the delivery was to the proper person, and this he must show as a matter of defence; for when it is once shown that he has delivered the goods to one not holding the bill of lading, a *prima facie* case is made out against him, which can only be rebutted by showing that although he made the delivery without the production of the bill of lading, yet he has in fact delivered to the very person who, according to the terms of the bill of lading, was entitled to receive the goods. In other words, the bill of lading is his contract by which he agrees to deliver the goods entrusted to him for transportation to the person named therein or to his order; and if he delivers them to any one else and loss ensues to the person entitled to receive the goods, he becomes liable. This is what we understand the charge to mean when read in connection with the facts of the case.

The case of *The Idaho* (93 U. S., 575), is not, as we understand it, in conflict with these views. There, Porter & Co., of New York, advanced a large sum of money to Forbes, of New Orleans, upon the security of a bill of lading issued by the brig "Colson," but before the cotton was actually loaded into the brig, Forbes had it transferred to the steamship "Lodona," and consigned to Schaefer & Co., of New York. The cotton, upon its arrival in New York was fraudulently transferred to the libellants, who, in collusion with Schaefer & Co., shipped it by "The Idaho" to Liverpool, and upon its arrival there was delivered to the agents of Porter & Co., as the true owners; and it was held that the ship was not liable, because it was clear from the evi-

dence that Porter & Co. were the real owners of the cotton, and upon its delivery to them the ship was relieved from liability to the libellants, who held its bill of lading for cotton to which they had never been entitled.

Practically the cotton was stolen from Porter & Co., who were the real owners, and the case therefore really decides nothing more than this: that where stolen property is delivered to a carrier for transportation, and a bill of lading for it is issued to the thief or one of his accomplices, the carrier may defend himself from an action brought by the thief or one to whom he has undertaken to transfer the bill of lading, for non-delivery of such property, by showing a delivery to the rightful owner. This is upon the well settled principle that even an innocent purchaser of stolen property (except negotiable notes and bills of exchange) acquires no title whatever to such property; and hence the holders of the second bill of lading—the one issued by "The Idaho"—had never acquired any right whatsoever to the property therein mentioned, and consequently the vessel was under no obligation to deliver the cotton to them.

It is true that Mr. Justice Strong, in delivering the opinion of the court, does go on to say that the fact that the shipper had obtained the cotton by fraud on the true owner, made no difference, and that the same rule would apply, even if the shipper had been innocent, and had been merely mistaken as to his right to the property; because, if he had no right to the property, the carrier incurred no obligation to him, as against the rights of the real owner. But to say nothing as to this being a mere *obiter dictum*, and assuming it to be good law, we do not see how it could be applied to the case now under consideration; for there can be no doubt that at the time the bills of lading were issued to McCauley & Co., and at the time they transferred them by endorsement to the plaintiff bank, McCauley & Co. were the real owners of the cotton, and as such had a perfect right to direct its delivery.

As to the 3d subdivision of the first exception we think it is too plain for argument, that if there was any understanding or agreement between McCauley & Co. and the Lawrence Manufacturing Company, that the cotton should be delivered to that com-

pany without the production of the bills of lading, it would be a palpable fraud upon the bank, unless the bank knew of such arrangement at the time it discounted the drafts and acquiesced in it. The bank certainly required the bills of lading to be transferred to it as a security for *the payment* of the drafts, as is conclusively shown by the retention of the bills of lading when the drafts were sent forward for acceptance; and any such arrangement entered into by McCauley & Co. with the Lawrence Manufacturing Company (if, indeed, there was any) without the knowledge of the bank, would be a manifest fraud upon it, as it would destroy the security upon which it relied.

The remarks just made show that the 1st subdivision of exception second cannot be sustained, for even if the jury did believe that there was such a contract as that there mentioned, the right of the plaintiff to recover would not thereby be defeated, inasmuch as to produce such result the jury must also believe that such contract was known to and acquiesced in by the bank. It is clear, therefore, that the Circuit Judge could not properly have charged as there requested.

As to the 2d subdivision of exception second, we agree with Judge Wallace that there was nothing to put the plaintiff upon inquiry, and therefore, to charge as there requested would have been inapplicable to the case as made, and a refusal so to do cannot be assigned as error. The bank held the bills of lading, indorsed by McCauley & Co., by which the carrier contracted to deliver the cotton to the order of McCauley & Co., and there was nothing to make the bank suspect that the carrier would commit a breach of its contract by delivering the cotton to any one without the production of the bills of lading properly indorsed. The words, "notify Lawrence Manufacturing Company at Lowell," contained in the bills of lading certainly did not authorize delivery to that company, without the production of the bills of lading. These words, as explained by one of the witnesses, simply "notifies the agent at the point of delivery that there is a bill of lading out, and not to deliver until the bill of lading is produced. It means also that the consignee is to be notified so he can get the bill of lading and get the cotton." It seems to us that those words, taken in connection with the stipulation to deliver to the

order of McCauley & Co., clearly show that the cotton, though intended for the Lawrence Manufacturing Company, could only be delivered to that company upon the order of McCauley & Co. Otherwise, that company would simply have been named as the consignee.

We also agree that the request which constitutes the basis of subdivision 3 of the second exception was properly refused, because it would have submitted a question of law to the jury.

As to subdivision 4 of the second exception, it seems to us that there are several reasons why the request therein referred to should not have been granted. In the first place, there is no evidence that the defendant knew at the time the cotton was delivered, that there were any drafts drawn against it. All that it knew was that bills of lading had been issued by its agent, stipulating for the delivery of the cotton to the order of McCauley & Co., and it had the means of completely protecting itself by refusing to deliver except upon the production of the bills of lading properly indorsed. Whether any drafts had been drawn against the cotton, and if so whether they were paid or unpaid, was a matter of no concern to the railroad company. All it had to do was to comply with its own contract, as evidenced by the bills of lading, and if it failed to do so, it must respond for any damages sustained by the lawful holder of the bill of lading, by reason of its failure to perform its contract. The drafts were not drawn until after the railroad company had made its contract by issuing the bills of lading, and therefore could not in any way affect the obligation which it thereby assumed. We do not see, then, that the defendant was entitled to any notice of the non-payment of the drafts.

But, in the second place, it appears that the cotton was delivered to the manufacturing company before the maturity of the drafts, and therefore it would have been impossible to notify the railroad company of the non-payment of the drafts in time to prevent an improper delivery of the cotton. In the third place, it appears from the evidence that notice was given to the railroad company within a reasonable time after the non-payment of the drafts.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.