## THE JOHN K. SHAW.

### RAPHAEL v. THE JOHN K. SHAW.

*(District Court, D. Maryland. April 12, 1887.)*

**1. BILLS OF LADING—PAYMENT OF DRAFT—TRANSFER OF TITLE.**

> A printed form of a bill of lading was signed in blank by the master of a canal barge before any cargo was put on board, and was filled up by the intended shipper as for a cargo of wheat to be delivered to a merchant, who, on the faith of it, accepted and paid a draft to which it was attached. *Held,* that as against the vendors of the wheat, who were ignorant of the issuing of the bill of lading, it did not transfer to the acceptor of the draft the title to a cargo of wheat, which was subsequently put on board under an agreement between the vendors and the shipper that they should retain their title to the wheat until it was paid for, and under an agreement that the barge should not be allowed to proceed on her voyage until payment was made.

**2. SAME.**

> *Held,* under such a state of facts, that the vendors of the wheat, having exercised their right to reclaim it, the holder of the antedated bill of lading could not proceed *in rem* against the barge for its value.

*(Syllabus by the Court.)*

In Admiralty.

*Robert H. Smith,* for libelant.

*Sebastian Brown,* for respondent.

MORRIS, J. This is a libel *in rem* against the canal barge John K. Shaw, to recover the value of a cargo of grain, which, it is alleged, the master contracted by a bill of lading to deliver to the libelant in Philadelphia.

A certain George W. Morrison, of New Castle, Delaware, who was engaged in the business of shipping grain under the firm name of W. H. Jefferson & Co., chartered the canal barge to carry a cargo of grain for him to Philadelphia. The grain was to be received on board at St. George's and at Delaware City. On the last days of September, or perhaps on the first day of October, 1886, and before any grain had been put on board, John Eveland, the master of the barge, at the request of Morrison, signed his name to a printed form of bill of lading. This printed form Morrison dated October 1, 1886, and filled up so as to read that he had shipped 3,510 15-60 bushels of wheat on the barge John K. Shaw, then lying at Delaware City and bound for Philadelphia, to be delivered to Raphael (the libelant) on his paying one and one-eighth cents per bushel freight. On the same day, October 1st, Morrison drew a sight-draft for $2,500 on Raphael, which he negotiated, with the bill of lading attached, and which Raphael paid in due course, receiving with it the bill of lading. On the twelfth of October, the grain not coming, Raphael telegraphed to the master of the barge at Delaware City to know why the barge had not brought the grain, but he received no reply. Raphael then went to Delaware City, and saw the master, who, in substance, refused to come to Philadelphia because the farmers from whom Morrison had procured the grain which had been put on board,

claimed to be the owners of it, and had forbidden his taking it to Phila-delphia.

The proofs show that there was put on board the barge in all 3,090 bushels of wheat under the following circumstances: A farmer named Reybold had been for some years in the habit of acting for Morrison as his agent in buying wheat from the farmers in the neighborhood of Del-aware City and along the canal. The grain was bought for cash, and was to be hauled by the farmers, with their own teams, and emptied in bulk into the canal-boats furnished by Morrison. As the grain was run into the hold, it was weighed, and the quantity ascertained. Then Rey-bold procured from Morrison his checks for the respective amounts due the farmers, and paid them.

Reybold began loading this barge at St. George's on October 1st, and on that day received from E. L. Mifflin 548 bushels of wheat, and from F. D. Reynolds 192 bushels. He had already advanced to Mifflin $350 on account. The barge was then moved to Delaware City, where, on the fourth, she received about 700 bushels, on the fifth nearly 2,000 bushels, and on the eleventh the balance, making up the total of 3,090 bushels. On the morning of the fifth Reybold learned that two checks, dated September 29th, which Morrison had given for grain purchased through him for a previous shipment, had gone to protest. He tele-graphed to the cashier of the bank, who replied that the checks had not yet been provided for, but that Morrison had said he would make them good that day. Reynolds also telegraphed for Morrison to come at once to Delaware City, and he replied that everything would be right, and that he would come that afternoon. Morrison did not come, and at 5 P. M. Reybold wrote him that he had stopped all the teams and should not haul any more grain until he saw him. After this, on the 11th, there was about 400 more bushels of grain put on the barge. The barge then lay at Delaware City until the fifteenth October, when, the grain not having been paid for by Morrison, the farmers, through their attorney, ordered the master to take the cargo to Baltimore, and the master, with the assent of Morrison, and upon the demand of the farmers and of Rey-bold, issued another bill of lading on the fourteenth October, making the grain on board deliverable to consignees in Baltimore. It was so deliv-ered, and was sold for the account of the farmers.

Reybold testified that all the grain was bought for cash, and was to be paid for as soon as delivered on board, and that, with respect to that put aboard on the fifth October and afterwards, there was a distinct agree-ment and condition that, if it was not paid for, it should be taken out. Mr. Higgins, who was the owner of 1,100 bushels, testifies to this, and that, knowing that Morrison was in financial difficulties, he would not have put his property on the barge upon any other terms. Neither Rey-bold nor Higgins nor any of the farmers knew, until the telegram from Raphael on the 12th, that a bill of lading had been issued by the master to Morrison.

It is contended, on behalf of the respondents, that the bill of lading held by libelant is altogether void, not only because signed by the master

before any grain had gone aboard, but also because it was signed in blank, and could not therefore specify what was to be carried or to what place or in what quantity, and that the master had no authority from the owner to bind him by such a signature to a blank paper. Some authority is found for this contention. In *The Joseph Grant*, 1 Biss. 193, it was held by Mr. Justice MILLER that a blank bill of lading cannot be made a contract binding the vessel or the owner, for the reason that the master has no implied authority to sign it, and that it no more bound the vessel than a bill of lading for goods not delivered to the vessel. But the case before Mr. Justice MILLER was one in which the master, after the cargo was on board, and before signing the blank, had already exhausted his authority and agency by signing a regular bill of lading for the goods, upon which they were actually delivered to the consignee named in it. It is, however, well settled that if, in anticipation of the delivery of goods to the vessel, the master signs a bill of lading, and the goods are subsequently delivered as and for the goods intended to be embraced in it, if there be no intervening title to the goods between the issuing of the bill of lading and the delivery on board, the bill of lading will cover the goods. *The Idaho*, 93 U. S. 582; *Halliday* v. *Hamilton*, 11 Wall. 564; *Rowley* v. *Bigelow*, 12 Pick. 314. And if the blank form of a bill of lading is signed by the master, with the intent that the shipper shall fill it for a certain voyage and at a certain freight and for such goods as may be subsequently in fact put on board, I think it might well be held operative as to the goods actually appropriated and so shipped. A formal bill of lading is not the only evidence receivable to show an intention to appropriate goods delivered to a carrier, and to pass the title to a consignee. But, in any event, such a bill of lading should be operative in no greater degree than if it had been delivered at the time the goods were really put on board; for, as it is the delivery of the goods to the vessel which gives it validity, its validity should be controlled by whatever circumstances would control the contract if not issued until after the specific goods were on board.

In this case there is evidence to prove that the understanding of the farmers, who furnished the grain, with Reybold, the agent of the shipper, was, that the barge was not to be taken away until the grain was paid for, and as to the greater part of the whole amount, which was put aboard after Morrison stopped payment, there can be no doubt that there was a distinct understanding that the grain should be taken out again if the money was not paid. And the master must have known that his barge was not being loaded, and that he was being detained because the farmers claimed to hold the grain until the purchase money was paid. If at that time he had been asked to give Morrison a bill of lading, he would have known that Morrison was not the owner of the grain, but that the farmers retained a *jus disponendi*. He could not at that time and with that knowledge have given a bill of lading which would have defeated their rights. *Thompson* v. *Trail*, 2 Car. & P. 334; same case on appeal, 6 Barn. & C. 36. And this is the difference which, in my judgment, distinguishes the facts of this case from those of *Row-*

*ley* v. *Bigelow*, 12 Pick. 306.   In that case the goods were not delivered upon any condition whatever, but, having been sold to a fraudulent purchaser, were unconditionally delivered to the carrier, who issued a bill of lading, and transported them to their destination without any notice of any infirmity in the title of the shipper.   The present case more nearly resembles *Hussey* v. *Thornton*, 4 Mass. 405, and *Dows* v. *Bank*, 91 U. S. 618.   In the latter case the shipper had received the grain under an agreement to hold it in his elevator as bailee until he had paid the purchase money for it, and the supreme court held that there was no such delivery to him as would enable him to transfer title to it by shipping it, and transferring the bills of lading for value to a stranger. A very similar case to the present one is *Coggill* v. *Railroad Co.*, 3 Gray, 546.

It would, of course, have been more regular for the vendors of the grain to have each taken a receipt from the master as evidence of their intention to retain a *jus disponendi;* and, in a commercial port where that method of retaining a lien on goods put aboard conveyances for transportation is established and well known, it might be that the court would hold that the absence of such a receipt was a decisive proof of an unconditional delivery; but whether a delivery is without any retention of a *jus disponendi* or not is always a question of intention to be derived from the acts, declarations, and circumstances accompanying the delivery.   *Prince* v. *Railroad*, 101 Mass. 546.   A barge lying in a canal in a farming country, for the reception of grain to be hauled and placed on board by the growers, is known to be loading under very different circumstances from a vessel receiving cargo in a commercial port.   She is in fact for the time being a warehouse for the collection of the grain which is to constitute the cargo.   Delivery on board is a prerequisite of payment; and when it is known to the master that the grain has not been paid for, that the vendors do not intend to relinquish their title to it, and that the retention of the title is necessary for their protection because of the failing condition of the shipper, under such circumstances the master cannot safely give a bill of lading to the shipper.

The proof is not very clear as to the knowledge of the master in this case, but I think enough appears from which it is only a fair inference that he well knew on October 5th why it was that he was being detained, and that he then knew that the barge was not to be allowed to leave until payment for the grain was made.   Notwithstanding, therefore, that an antedated bill of lading may be allowed to operate by way of estoppel and relation upon the grain subsequently put aboard, still it must be affected by whatever knowledge the master had, at the time the goods were actually ladened, with regard to the intention of the vendors not to unconditionally part with their property.

In *Bryans* v. *Nix*, 4 Mees. & W. 774, a case frequently referred to as authority on this class of questions, receipts for two cargoes of oats were obtained from the masters of two canal-boats, and drafts were drawn against them.   At the time the receipts were given, one boat was loaded, but the other was not, although the shipper had a cargo prepared for her.

Subsequently the shipper, being pressed by a creditor, agreed to give him the oats, and in fulfillment of that agreement, loaded the second boat, and obtained from the masters other like receipts for the cargoes of both boats, and transferred them to the creditor, who upon them obtained possession of both cargoes. It was held that the acceptor of the bill of exchange could recover the cargo which was loaded on the first boat when his receipts were obtained, but that he could not recover the grain loaded on the second barge, because it was not on board when his receipt was given. With regard to the second boat load, Baron PARK, in giving judgment, said that, if the oats had been put on board the second boat for the purpose of fulfilling the first contract, and were received by the master as such before any new title to the oats had been acquired by a third person, he should probably have held that the property in both boat loads passed to the plaintiff, who was the acceptor of the draft, and in that case, as to the cargo of the second boat, the receipt might have operated as an executory agreement that, when the oats were ladened on the second boat, the master should hold them for the plaintiff so that, when the agreement was fulfilled, they would have become his property. But, before the agreement was fulfilled, the shipper had been induced to enter into another engagement to deliver them to the defendant. The plaintiff had an agreement with the shipper that the oats to be loaded on the second boat should be sent to him, and the defendant subsequently obtained an agreement that they should be sent to him. Both contracts were executory until the oats were appropriated by some new act; and Baron PARK held that the signing of the receipt for the oats, after they were put on board the second boat in execution of the second contract, was the first act by which the oats on that boat were specifically appropriated. This decision has been questioned, because it has been said that the facts found by the jury and stated by the reporter do not sustain the position taken in the decision; but the law, as applicable to the facts assumed by the court, is not questioned.

Applying the doctrine of *Bryans* v. *Nix* to the present case, it would follow that any contract, agreement, or understanding which Morrison had with the vendors of the grain, after the issuing of the blank bill of lading, and while the grain was going aboard, even though unknown to the master, and which was subsequently executed by the signing of new bills of lading by the master under which they took possession, can be sustained as against the holder of the first bill of lading. It is very true that it is settled law that, where a vendor delivers goods to a carrier by order of a purchaser, the appropriation is determined. Delivery to the carrier is delivery to the vendee, and the property vests immediately. Benj. Sales, § 362; *Halliday* v. *Hamilton*, 11 Wall. 560; *Prince* v. *Railroad Co.*, 101 Mass. 542. But this rule is not contravened by asserting the *jus disponendi* of the vendor, when the circumstances evidence an intention to retain, and where there is a special agreement to retain it. If the goods are not delivered to the carrier unconditionally as goods to which the shipper has acquired title, the carrier cannot validly agree, and certainly by an antecedently issued bill of lading he cannot contract,

to deliver them in disregard of the retained title of the unpaid vendor. Now, in this case, Reybold was Morrison's agent in purchasing, receiving, and shipping the grain, and he declares that the grain was to remain the property of the farmers until paid for, and that, although put on the barge and thus received by him, it was with the understanding that it was not unconditionally delivered, but that the barge was not to leave Delaware City until it was paid for, and that, as a great deal of it was received by him after he knew that Morrison had stopped payment and gone to protest, he was careful to make this agreement. It is conceded that there is no statute of Delaware which affects the question of a conditional delivery of chattels, or which legislates with regard to bills of lading, and there is no rule of the common law which forbids such a transaction. *Harkness* v. *Russell*, 118 U. S. 663, 7 Sup. Ct. Rep. 51; *Coggill* v. *Railroad Co.*, 3 Gray, 545. Even though a bill of lading be given for goods regularly delivered on board, if the carrier discover that the shipper had no title and the true owner demand them, the carrier may deliver them up to the true owner in disregard of the bill of lading thus wrongly obtained. *The Idaho*, 93 U. S. 575.

The grain being the property of the vendors, it was rightly given up to them without requiring them to resort to legal process, except as to the portion of Mifflin's grain which was paid for by the $350 advanced to him by Morrison, and which respondent has tendered. The decree will be in favor of the libelant for the proper value of so much of the Mifflin grain as had been paid for. Each party must pay his own costs.