In the Matter of the Estate of FRANCES VAUGHN HYDE, Deceased.

Surrogate's Court, New York County, September 15, 1933.

*Arthur M. Levy*, for the executor, John Newton Porter.

*Earle & Rust* [*Cornelius V. Coleman* and *Thornton Earle* of counsel], for the objectant, George G. Hyde.

DELEHANTY, S.   By will dated April 4, 1916, deceased directed that all her property (other than an article of jewelry and some paintings and pictures) be put in trust for her son George until he became twenty-one, and that he should then have the principal. Deceased died January 24, 1921.   Her will was not probated until November 24, 1930, and letters were issued to accountant December 6, 1930.   This lapse of nearly ten years in moving for probate of the will was due entirely to accountant and is part of a plan sufficiently shown by the record whereby he hoped to appropriate to himself all the property of deceased.

When the will was made the son of deceased was a boy of twelve. He is now about twenty-nine and is entitled presently to the whole residuary.

On January 5, 1917, deceased was taken to a sanitarium in Connecticut.   She then was insane.   She had long suffered from paresis, and prior to the making of the will had been in a sanitarium in New York city.   She was regularly in receipt of a substantial income which terminated upon her death.   In the interval between her leaving the New York sanitarium and her confinement in the Connecticut institution she maintained a household of which accountant was a member.   It is plain from the letters of deceased

and from the other proof in the case that she, so far as she was capable of action and emotion, entertained a deep affection for accountant and reposed in him absolute confidence. In substance, he undertook the management of her affairs. More than six years before her commitment to the Connecticut institution he had borrowed a large sum of money from her. He made refund of the balance of this loan about the middle of 1917. During all this period accountant operated a business under a corporate title and in that business employed one Miss Eggo as his secretary. She was also the attorney in fact for deceased. Miss Eggo died prior to the hearings on this accounting. In a practical sense the record shows that accountant during the lifetime of deceased had full dominion over her property and money, either by his direct possession of it, or through his control of deceased's attorney in fact.

In the four years of deceased's confinement in the institution accountant maintained in New York an apartment in which he used the goods of deceased. An apartment under lease to deceased when she was committed was thereafter sublet and accountant in the lifetime of deceased received the rental from the subtenant. Over this period of four years the son of deceased either resided in the apartment so maintained by accountant, or was at school or in camp. The son was led to believe by accountant that the expenditures made for him and the comforts furnished to him were at the cost of accountant. The record satisfies the court that on the contrary substantially all of such expenditures were made out of funds belonging to deceased.

Following the death of deceased, the son, then about seventeen, was told by accountant that various legal difficulties would delay the administration of the estate, and was assured by accountant that the jewelry, silverware, tapestries and other valuables of his mother were being carefully stored and would eventually be turned over. It was not until the son had attained manhood that accountant took any steps for the administration of the estate, though concededly he was aware throughout the entire period of delay that the will of deceased was in a safe deposit box on which he irregularly paid the rental charges. Having been called to account in this proceeding, he first filed an account verified May 28, 1932, wherein he stated that he had received no property, that no debts were due the estate, that he had paid nothing, that there were no creditors, and that the legatees were entirely without interest. Subsequently, and on June 29, 1932, accountant filed a further account wherein he reported as an asset a bond alleged to be of the value of $1,464.48. Objections to his accounts were filed by the

son of deceased, asserting in substance that accountant was chargeable with the sum of $3,500 taken by him from the funds of deceased and not repaid, and was also chargeable with the value of all furniture, furnishings, jewelry and other valuables of deceased not specifically bequeathed. Accountant was examined before trial and was again examined in the hearings on the issues raised by the objections. Whether involuntarily or deliberately, he is vague and uncertain in his statements as to what he did respecting the property of deceased. Even in respect of matters where certainty would have been in his own interest he has remained inconclusive. In his various examinations, however, sufficient has been shown out of his own mouth to condemn him.

Having in the summer of 1917 paid into the account of deceased a balance of nearly $6,000 then remaining due upon deceased's loan to him which had been running since 1911, accountant (during deceased's confinement in the Connecticut institution) procured from her funds the sum of $3,500. There is in evidence (Exhibit Y) a receipt for this amount on a form originally providing for $4,000 and originally dated November 30, 1917. As the instrument now reads it acknowledges receipt on April 13, 1918, of " payment " of the sum of $3,500, " being moneys due me from Frances V. Hyde." Accountant first asserted that this " payment " was refund of money expended by him for the boy. It is clearly established that no such expenditure had been made. Accountant next asserted that the money had been given to him. The record demonstrates that this money was obtained by accountant without the conscious knowledge of this insane woman through the control which accountant had over his secretary, Miss Eggo. The transaction constituted plainly a misappropriation of the money of deceased, and in consequence there exists in favor of the estate a claim in the amount of $3,500, with interest at the legal rate from the date the money was withdrawn from deceased's account. Accountant is surcharged with this sum, with interest from April 13, 1918.

Accountant took into his charge all the personal belongings of deceased, including her furniture, furnishings, silverware, jewels, works of art and all her movables. In his confused account of his handling of these properties he eventually asserted title thereto by gift. That assertion is fraudulent. No gift is shown, but, on the contrary, it is clearly established on the record that the property in question was that of deceased and that he is accountable therefor or for its value. On his examination he admitted the present possession of some of the property — some furniture and some books. It is not clear from the record whether he has definitely admitted the possession of certain jewelry and silverware. In so far

as he has possession of such property the decree will direct that it be turned over to objectant.

The real difficulty in the case is the determination of the amount for which accountant should be surcharged in respect of that property which was disposed of by him. In his appropriation thereof he has removed substantially the possibility of obtaining proof respecting precisely what it was and what was its value. His delay of ten years in proceeding with the business of the estate committed to him was undoubtedly designed to achieve this result.

Courts are astute to find a basis to compel restitution by a wrongdoer. " Guided by the cardinal principle that the wrongdoer shall make nothing from his wrong, equity so moulds and applies its plastic remedies as to force from him the most complete restitution which his wrongful act will permit." (*Mooney* v. *Byrne*, 163 N. Y. 86, 97.) Since *Armory* v. *Delamirie* (1 Strange, 505; 93 Eng. Rep. 664) courts have held accountable in the highest degree any one who by his misappropriation of goods has made precise ascertainment of their value impossible. In the cited case a chimneysweep had found a valuable jewel which he took to a jeweler to ascertain its value. The jeweler's apprentice removed the jewel from its setting, said to the chimneysweep that the article was worth only a few pence and offered that sum. The chimneysweep demanded back his article but received only the setting. The court held the jeweler liable for the value of a jewel of the finest water of a size which would fit the setting. In *Clark* v. *Miller* (4 Wend. 628) the court had before it the claim of a plaintiff who had delivered cattle to defendants for sale. The latter refused to give any information as to the terms of their sale. The court said: " The evidence as to the value of the cattle was somewhat contradictory; but it is to be borne in mind that it was in the defendants' power to remove all doubt on the subject, as they and they alone knew to whom they were sold, and for what price. Under such circumstances, it was the duty of the jury to allow the highest sum which, according to the evidence in the case, they could probably have been sold for."

In *McGill* v. *O'Connell* (33 N. J. Eq. 256) the court had before it the claim of a minor against the estate of a deceased guardian who had taken the furniture of the minor's mother after the latter's death and had sold it through an auctioneer, and who had also taken from the mother's belongings a note to her order signed by the guardian himself. This note was found in the guardian's papers with the signature torn off. The court held the estate of the deceased guardian liable for the amount of the note and for the value of the furniture. It repudiated the idea that the guardian's

estate could escape liability on the claim that title to the property was in the mother's estate. It applied the maxim " *Omnia praesumuntur in contra spoliatorem.*" So, *Bailey* v. *Shaw* (24 N. H. 297).

The court may not, however, determine the money liability for goods so disposed of unless at least some proof of value is in the record. (*Harris* v. *Rosenberg*, 43 Conn. 227, 232; *Bethel* v. *Linn*, 63 Mich. 464.) The difficulty in proof, however, is no bar if *some* proof there be. (*Yesbera* v. *Hardesty Mfg. Co.*, 166 Fed. 120, 123.) The record here is not without its difficulties in this aspect. In part the difficulty arises by reason of the doubt whether all the goods listed in the catalogs in evidence (Objectant's Exhibits A and C; accountant's Exhibits 1 and 13) were the property of deceased. Accountant cannot escape liability because of this confusion of goods. " The rule of law and equity is strict and severe on such occasions. If a party having charge of the property of others, so confounds it with his own, that the line of distinction cannot be traced, all the inconvenience of confusion is thrown upon the party who produces it, and it is for him to distinguish his own property or lose it. If it be a case of damages, damages are given to the utmost value that the article will bear." (KENT, C., in *Hart* v. *Ten Eyck*, 2 Johns. Ch. 62, 108.)

When the confusion is fraudulent (and here it was part of a general scheme of fraud by accountant) the wrongdoer loses all the value of his own goods unless he establishes which were his. (*The Idaho*, 93 U. S. 575, 585, 586.) The burden of proof in such situations is wholly upon the guilty party, and if not sustained, the innocent party takes the whole. (*Gurney* v. *Tenney*, 226 Mass. 277.) Applying these rules in *Tujague* v. *Courtiade* (140 La. 779) the court there held that the widow and the son of deceased, who were shown only to have gone to his safe deposit box and removed articles therefrom of which the identity was not known, were liable for the entire value of securities purchased by deceased recently before his death, upon the showing only that there was no evidence in his accounts of any disposal of the securities.

Applying to the facts here the principle enunciated by Chancellor KENT and applied in the cited cases, the catalogs in evidence show that a quantity of furniture (concededly containing that here adjudged to be the property of deceased) was sold by accountant at auctions held September 18, 1918, and on March 20, 1930. The pencil notations in one of the Knickerbocker catalogs show column footings aggregating $4,150.37. These footings aggregate the same sum as is shown by the bill of the auctioneer in evidence as accountant's Exhibit 12. There is admission by accountant that the notations in one of these catalogs were in part made by

him at the time of the auction. There is thus furnished at least that minimum requirement of proof of which the cases speak. In the catalog which is in evidence as objectant's Exhibit C (another copy of which is in evidence as accountant's Exhibit 13) there are notations in the margin of a page on which certain rugs are listed. Accountant testified that deceased owned certain rugs and that some of them had been auctioned. He asserted that several of the rugs in the sale were not those of deceased. He did no more than that. He furnished neither explicit nor convincing proof as to which rugs actually belonged to deceased nor as to what price had been received for her rugs. Accordingly, under the rule, he is chargeable with the full amount received for all the rugs, or $1,575.

He is entitled to no refund for expenses. In a case of spoliation no compensation for outlays is permitted for the sound reason that there would have been none had the spoliator dealt honestly with the property. The expenses referred to in the auctioneers' bills would, of course, not have been incurred had accountant preserved and protected the property committed to him in trust. Accountant will be surcharged with the gross amount of the sales made through Knickerbocker Sales Rooms, Inc., in the aggregate sum of $5,725.37, which is the apparent total of furniture sales plus the rug proceeds. This surcharge will carry interest from the date of sale, September 18, 1918. Accountant will be surcharged also with the gross proceeds of sales made by Silo on October 17, 1919, aggregating $215, with interest from that date. Accountant also will be surcharged with $190, the proceeds of another sale by Silo on March 31, 1930, with interest from that date. Accountant will be further surcharged with the sum of $300, which he admitted having received in 1919 or 1920 for one item of jewelry. Interest on this item will run from December 31, 1920. In respect of the rest of the jewelry not in accountant's possession, and in respect of any other articles which have been disposed of otherwise than through the auction rooms, and in respect of the silverware, the record is barren of any proof upon which the court can fix a value, and hence no surcharge can be imposed therefor. If the objecting son is able to furnish any proof in respect of this property which would conform to the rule, the court will entertain an application for leave to reopen the proceeding for the purpose of such additional proof.

In consequence of the fraud upon the estate for which accountant has been held responsible, he is not entitled to and will not be allowed either commissions, or counsel fees, or costs. Objectant's costs in this proceeding will be charged against accountant personally.

Proceed accordingly.