## Thomas Stephenson v. William L. P. Little and others.

In trover the right of property is in issue; and to sustain the action plaintiff must prove property in himself, either general or special.

Possession is evidence of property, but it does not, in an action of trover, preclude defendant from showing property in a third person.

In trover property in a third person may be proved under the general issue.

The General Government has all the common law rights of an individual in respect to depredations committed upon the public lands. And the Commissioner of the General Land Office—being the proper executive department to enforce those rights—in the absence of legislation by Congress on the subject—may lawfully direct the seizure and sale by the local land officers, on behalf of the Government, of timber cut by trespassers on the public lands.

The party guilty of a fraudulent admixture of saw logs owned by himself with those owned by another, so that it is impossible any longer to identify his own, loses all interest in them, and is remediless if such other person appropriate the whole mass

STEPHENSON *v.* LITTLE.

[☞ to his own use. Per MANNING J., CHRISTIANCY J. concurring. CAMPBELL J. dissented, holding that, where the evidence showed the logs to be of a uniform value per thousand feet, the person who had intermingled them was entitled to reclaim from the common mass an equivalent to his own logs. MARTIN CH. J. gave no opinion on this question.

Per MARTIN CH. J., the person whose property another has fraudulently admixed with his own, has the right to take possession of the whole mass for the purpose of separating and securing, or of disposing of, the portion belonging to himself; and if it cannot be separated, and he advertise and sell his interest in the whole, he does not thereby render himself liable to the other for the conversion of his property. He has, at the very least, as respects the property so commingled, the rights of a tenant in common.

*Heard January 17th, 1861. Decided July 21st.*

Case made after judgment from Saginaw Circuit.

The action was trover, brought by Stephenson against William L. P. Little, Moses B. Hess and Daniel Boutell, for a quantity of saw logs. Plea, the general issue.

It appeared in evidence that in the winter of 1856–7 plaintiff got out and hauled upon Potobaco lake and its outlet some 2,600 pine saw logs. A portion of these was cut on and owned by the plaintiff, and others upon land belonging to the Government. Still another portion was cut upon lot three of section thirty in township fifteen north of range five east, on which plaintiff seems to have commenced cutting as early as November, 1856, and got the logs all off by the 20th of January, 1857. The facts in relation to this lot three were as follows: June 2d, 1856, plaintiff had entered at the (then) Genesee land office the south half of the north west quarter of said section thirty. On the thirtieth of August following he applied to the Register and Receiver to change this location for said lot three, alleging a mistake in the original entry. The officers forwarded to Washington the necessary papers to obtain consent to this change, and the Acting Commissioner of the General Land Office, under date of September 15th, 1856, wrote them as follows — after stating that he was satisfied the first entry was made through mistake — "I have therefore to request that you will permit Mr. Stephenson to withdraw the said entry, and to apply the amount paid thereon to the lot number three of section thirty, township fifteen north of range five east,

if vacant, it being the tract for which he wished to change it." Notice of this authority was sent by the Register to Stephenson in February 1857. The difference in the price of the two lots was only one dollar, which was paid by Stephenson, but before any duplicate was issued for lot number three, the Register and Receiver ascertained that Stephenson had taken the timber from the lot first entered, and they then refused to take further steps in reference to the change of location.

On the 12th of May, 1857, defendant Boutell spoke to Bird, the person in charge of the logs for Stephenson, and forbade his having any thing more to do with them; saying that he, Boutell, was put in charge of them. At the same time the following notice was posted in public places by the Register and Receiver.

#### " Sale of Logs and Lumber.

Notice is hereby given that we, the subscribers, the Register and Receiver of the Saginaw Land Office, have seized about 2,500 logs, and a quantity of square and flatted timber, cut by trespassers from government land, which we shall expose for sale at auction to the highest bidder, on the 25th of May instant, at two o'clock P. M., at the mouth of Potobaco lake, in town 15 N. R. 5 E., where said logs and timber now are.

May 12th, 1857.        M. B. HESS, *Register*.

WM. L. P. LITTLE, *Receiver*."

At the date of this notice a part of the logs were boomed. A storm subsequently scattered them, and a portion were driven out into Saginaw Bay and lost. This occurred before the time fixed for the sale.

On May 25th, the defendant Little attended at the outlet of Potobaco Lake, in sight of the logs, and made the sale. An agent of Stephenson's was present and forbade it. Little, in making the sale, said the logs had been cut on government land, and he sold the right, title and interest of the Government in and to them. They

were purchased by one Hart, who acted in so doing as agent for Stephenson; but it was testified by Hart that Stephenson failed to pay the amount of the bid, and one Frazer paid 'it, and took a bill of sale of the logs.

To show the authority of the officers to make the seizure, defendants gave in evidence a circular from the Commissioner of the General Land Office, dated December 24th, 1855, addressed to the several Registers and Receivers, giving them full directions to take charge of the public lands and prevent trespasses, and when timber should be cut or removed by unknown trespassers, to cause it to be seized and sold at auction, under such regulations as their discretion might suggest. This evidence was admitted under objection.

On some points in the case the evidence was somewhat obscure, and different views were taken of it by the Judges; but the foregoing is all that it is deemed important to give in this place in order to an understanding of the legal questions. The Circuit Court rendered judgment for defendants.

*Sutherland & Miller*, for plaintiff:

The possession of the logs by plaintiff was prima facie evidence of property in the plaintiff, and conclusive against all persons disturbing that possession officiously, without having or acting under and in privity with a better title:— 11 *Wend.* 54, 58; 13 *Wend.* 63; 2 *Taunt.* 309; 1 *Strange*, 504; 2 *Bing.* 173; 2 *Bing. N. C.* 98; 8 *A. & E.* 878; 9 *Bing.* 279; 10 *C. B.* 713; 12 *Wend.* 30; 13 *Johns.* 276; 11 *Johns.* 132; 9 *M. & W.* 460; 9 *Gill*, 7; 19 *Ala.* 130; 4 *Flor.* 283; 3 *Jones* (*N. C.*) 306; 33 *Me.* 132; 7 *Wheat.* 27; 8 *Cranch*, 229; 1 *E. D. Smith*, 393; 11 *East*, 65; 25 *Me.* 411. Nor does plaintiff by bringing trover acknowledge that defendants obtained possession of the property lawfully. The manner of getting possession is material, and the taking itself, if tortious, is a conversion; while if not tortious, a

conversion must be shown by proof of subsequent facts :—
8 *Pick.* 545; 19 *Conn.* 319; 1 *McCord,* 213, 428; 15 *Johns.*
431; 17 *Vt.* 176; 23 *Wend.* 462.

Defendants had no right, on behalf of the Government,
to make the seizure. It devolves upon Congress to make
all needful rules and regulations respecting the public domain :
— *Const. Art.* 4 § 3, *clause* 2. An act of Congress must
therefore be the basis of defendants' authority to seize.

Even the Commissioner's instructions do not authorize the
seizure where the trespasser is known, as was the case here
if any trespass had been committed.

The plaintiff showed title to lot three. The entry of the
S. $\frac{1}{2}$ of N. W. fr. $\frac{1}{4}$ of sec. 30 was claimed to have been made
through mistake for this, and the claim was allowed by the
Land Department, and the entry ordered to be changed.
This order has never been vacated, and is a judicial determi-
nation which the local land officers had no power to reverse
or control. The plaintiff paid in full for lot three, and did
every thing which was required to be done on his part. The
omission of the land officers to make the proper entries, or
to issue the proper papers, cannot affect his rights. As
purchaser he was entitled to take possession, and was liable
for taxes. He was owner from the date of the original
or erroneous entry :— 3 *How.* 459. But fraud is alleged,
because it is said plaintiff trespassed upon the lot on sec.
30 in the winter of 1855–6. We deny the trespass, but
insist that the Court erred in admitting evidence to prove
it, as well as in finding fraud from that evidence. If the
trespass were proved, it could not take away plaintiff's right
to have the mistake corrected, and Government could not
compel him directly to buy the land trespassed upon, nor
indirectly by denying him the right to have the mistake
corrected. The plaintiff is not outlawed or disfranchised by
the trespass, but is to be punished for it as the law has
provided. The contract of purchase is not avoided by
actual fraud, except at the option of the defrauded party,

and on refunding what has been received : — 14 *Barb.* 594; 1 *Denio,* 69, 302 ; 2 *Hill,* 288 ; 5 *Hill,* 390 ; 2 *Denio,* 136 ; 5 *Barb.* 322 ; 4 *Mass.* 502; 15 *Mass.* 319 ; 1 *Metc.* 547 ; 4 *Mich.* 508.

Plaintiff did not lose his rights by *confusion of goods.* The cases of confusion of goods are divided into three classes : 1. Those showing intermixture by consent, and therefore tenancy in common : 2. Those showing intermixture of articles of uncertain quantities or dissimilar qualities or value, by act of one party, by mistake, negligence or design, where the party causing the intermixture must bear all the consequences, even to the loss of his property, if necessary to save the rights of the other party : — 2 *Johns. Ch.* 62 ; 1 *Hill. on Torts,* 526 ; *Story on Bailm.* §40. 3. Those in which occurs an intermixture of articles or effects of like kinds and value, the quantity whereof may be ascertained. Here the motive of the intermixture is immaterial. Each party is entitled to take from the mass such proportion as his original quantity bears to the aggregate : — 30 *Me.* 237 ; 20 *Me.* 287 ; 21 *Pick.* 298 ; 15 *Ves.* 442 ; 5 *Pick.* 7 ; 2 *Pick.* 86 ; 6 *Gray,* 134 ; 18 *Ill.* 287.

In this case there was no proof of such an intermixture as prevented defendants from separating the logs belonging to plaintiff. And if there were, the plaintiff was still entitled to his proportion of the commingled mass.

*Webber & Wheeler,* for defendants :

The consent for a change of entry, given by the Commissioner of the Land Office, did not give plaintiff any title to lot three, because given under a mistake of facts, brought about by the fraudulent conduct and concealment of plaintiff. Even if the change had been perfected, Government would have been remitted to its original rights, on account of the fraud.

The greater portion of the logs being cut from Government lands, and they being unmarked, and so mixed that

STEPHENSON v. LITTLE.

their identity was destroyed, the doctrine of *confusion of goods* applies, and Government had the right to take the whole. The facts clearly show that the mixture was both negligent and fraudulent on the part of plaintiff: — 11 *Metc.* 495; 2 *Bl. Com.* 405; 21 *Pick.* 305; 3 *Comst.* 379 *and note,;* 30 *Me.* 237, 295; 20 *Wend.* 275; 7 *Cow.* 95.

If the admixture was not willful or negligent, the Government would then have been tenant in common wit plaintiff, and as such had a right to sell its interest, which was all the officers assumed to sell.

The Commissioner of the Land Office had the right to direct defendants to make the seizure on behalf of the Government: — 5 *U. S. Stat. at Large,* 107. But the question of authority does not arise in this case. Defendants may defeat the recovery by showing title in a third party without connecting themselves with it: — 1 *Burr.* 31, 8 *T. R.* 336; 11 *Johns.* 529; 14 *Johns.* 128; 15 *Johns.* 207; 2 *Greenl. on Ev.* § 648. Even if plaintiff were entitled to recover, it would only be the amount bid by him through his agent Hart: — 17 *Pick.* 3; 10. *Metc.* 317; 35 *N. H.* 226; 24 *Me.* 339; 14 *Pick.* 356; 2 *Greenl. Ev.* §§ 276, 649.

Defendants are not liable for the loss by the storm. There is no evidence of any interference by them with the care and custody of the logs. It does not appear that plaintiff was prevented from a joint occupancy. No want of ordinary care is shown, and the joint owner of a chattel is only bound to bestow upon its preservation the care which a prudent man ordinarily bestows upon his own property: — *Guillett v. Dossat,* 4 *Martin La. Rep.*

MANNING J.:

The judgment I think should be affirmed. In trover the right of property is in issue, and to sustain the action plaintiff must prove property in himself, either general or special. Possession is not sufficient for that purpose, as in trespass. It is evidence of property, but it does not, as in

trespass, preclude defendant from showing property in a third person. The 'theory of the action is that the goods belong to the plaintiff, that he lost them, that they came to defendant's possession by finding, and that he afterwards wrongfully converted them to his own use. As plaintiff never had any property in the logs cut by him on Government lands, it follows that the action can not be sustained as to them, whether defendants were authorized or not to take possession of them by Government. As to the logs cut on plaintiff's own land, the case is different. They belong to the plaintiff unless he has lost his property in them by what the law terms a confusion of goods. It is for the Government to avail itself of this right, and not the defendants, unless they acted by authority of the Government, or the Government afterwards ratified their acts.

It is said there is no act of Congress authorizing defendants, or making it their duty, as Register and Receiver of the Land Office, to seize logs wrongfully cut on Government lands. This is the broad objection taken to the instructions from the General Land Office under which the defendants acted. It seems to me there can be no doubt that government has all the common law rights of an individual in respect to depredations committed on its property, and that where there is no statute making it the duty of any particular officer to enforce those rights, it is *ex necessitate rei* made the duty of the executive department of the Government to enforce them. This being the case—and it seems to me too clear to admit of a doubt—the question is not whether the Register and Receiver of the Land Office were officially bound to do what they did, so long as they acted under instructions from the Commissioner of the General Land Office, the executive department of the Government having charge of the public domain. Nor was it necessary, to enable them to show they so acted, that they should have given notice thereof with their plea of the general issue. For the object of the evidence was not so much to

show their authority for taking all of the logs, as the act of the Government claiming and insisting on its right to all, by reason of the confusion. In trespass the object of such evidence is not to prove property in a third person, but to show authority from the owner of the property for taking it; while here the sole object was to show property in the Government to that part of the logs which, before the confusion occasioned by the intermixture, belonged to plaintiff.

The party guilty of a fraudulent confusion of goods loses all interest therein, on the principle, I take it, that by the admixture he is unable any longer to identify his own, and is therefore remediless, unless on the equitable principle of giving him a part of the common mass equal to what he originally possessed, where the goods are of equal value, and it can be done without injury to the other party, and fraud does not intervene to prevent its application. Whether correct or not in what I suppose to be the reason of the rule, the rule itself is too clearly established to be called in question:—*Ryder v. Hathaway*, 21 *Pick.* 298; *Willard v. Rice*, 11 *Metc.* 493; *Hesseltine v. Stockwell*, 30 *Me.* 237; *Bryant v. Ware*, 30 *Me.* 295.

The logs taken from the government land were so mixed with those taken from the plaintiff's own land, that one could not be distinguished from the other; and from the evidence in the case, I think this was done designedly, and with a view of defrauding the Government.

The application to exchange the south fractional half of the north-west quarter of section thirty, for lot three of the same section, after the plaintiff had stripped it of the timber, without disclosing that fact in his petition, and the taking of the timber from lot three before he was notified that the Commissioner of the General Land Office had given his consent to the change, was an attempt to defraud the Government, which it was the duty of the Receiver of the Land Office, on discovering the facts, to prevent, as he did. To my mind, the evidence shows a

clear case of fraudulent intermixture, by which the plaintiff has lost all right to the logs taken from his own land and intermixed by him with the far greater number of logs taken from lot three, and other lands belonging to the Government.

I think the judgment should be affirmed, with costs.

CHRISTIANCY J. concurred in this opinion.

CAMPBELL J.:

It appears from the evidence in this case, that Stephenson was the owner of the north-east quarter of the north-east quarter of section twenty-five, in town fifteen north of range four east, and of the north half of the north-west quarter of section thirty, in town fifteen north of range five east: that he had previously entered the south half of the north-west quarter of section thirty, and had obtained the authority of the department to change the entry for lot three, in section thirty, and had paid for the latter lot, of which the duplicate was withheld by one of the local land officers of his own motion, on an allegation of fraud.

The logs in controversy were cut in the winter of 1856-7; 211 trees on the land patented to plaintiff, 327 trees on lot three, and the balance on government lands; 194 on the south half of the south-east quarter of section thirty, 9 on the south half of the south-west quarter, 132 on the north half of the south-west quarter of the same section, and 17 on the south-east quarter of section twenty-four in town fifteen north of range four east; making in all 352 trees cut on government lands, exclusive of lot three. The logs and timber from these trees were banked, a part on Potobaco lake, a part on a creek through which it empties into Saginaw Bay, and a part on Saginaw Bay. The locality of these places becomes important in the view I have taken of the facts, and I therefore proceed to describe it. Potobaco lake forms the easterly boundary of

the lands' patented to plaintiff, and thence extends south-easterly, not touching any of the other lands on which trees were cut that winter, and its mouth and the creek are both entirely within lot two, and just north of lot three which lies upon the bay. Lot three is the north part of the south-east quarter of section thirty.

It appears that all of the logs from plaintiff's patented lands were banked on the lake, amounting by the testimony of the witnesses on both sides to about 1000 logs. The remaining amount of nearly 1600 logs, cut from the various lots on the south half of section thirty, were banked on the creek, and scuth of it along Saginaw Bay. The plaintiff's witnesses show that the logs from lot three (which is the northerly part of the south-east quarter) were drawn first and taken to the creek, and banked along it near its mouth behind a small island, and on Saginaw Bay at the mouth. The defendants' witnesses also show that the logs cut from the south half of the south-east quarter were banked on Saginaw Bay, and the same testimony shows that there were several different roads to the water along which the logs were hauled out from the various localities. The logs cut from the south half of the section were, as before mentioned, all banked near the mouth of the creek and along the bay. The logs at and near the mouth of the creek when placed in it in the spring filled up all the space in it. At the time of the seizure the logs in the lake were near its mouth, and some had been rafted into the creek. After the seizure and before the sale, a storm arose which scattered the logs at the entrance of the bay, leaving about half of the entire amount undispersed, and scattering the rest along the shore of the bay for some distance.

The logs were all seized by defendants, claiming them as cut from Government lands, and they were at once advertised for sale, and sold in about a fortnight.

Inasmuch as the plaintiff was the undisputed owner of

all logs cut on his own land, and could not forfeit them by any fraud or misconduct in depredating elsewhere, he is certainly entitled to recover for the conversion of those, unless precluded by some other rule. No man, however criminal, can be ' deprived of his property by the acts of others whom he may have defrauded. The remedies for such misconduct are to be sought otherwise; and, in case of trespasses on government lands, they are laid down by acts of Congress. I.make no inquiry into the authority of defendants to act for the Government, but assume that they were fully authorized as government agents. In an action like this, I think the plaintiff should only recover his own damages, and therefore their authority is not important.

It is claimed that plaintiff forfeited his logs by so intermingling them with the logs of the Government that there became, a confusion of property so as to defeat its identification; and that the whole property thus became divested. Upon a careful consideration I have been unable to discover anything in the case justifying any such consequences. Before any one can forfeit his own property there must. be clear proof that by the fault of the party the property of another with which it is blended can no longer be identified, even with the utmost care; and that the latter can not be made whole by taking his proportion out of the entire mass so as to obtain a share of the same kind and equal value.

In the first place I have searched vainly for any evidence which shows such a total confusion as is necessary under any rule of law to create an entire forfeiture of plaintiff's logs. If property be in several parcels, and the property of another person is confused with one of these parcels, it can have no effect upon those kept distinct. This can not be pretended on any reasonable theory whatever. In the case before us the evidence is entirely clear that no portion of the logs in Potobaco Lake came from government lands. And it is equally clear that they

were not before the seizure mixed with the logs below. Concerning these, I see no shadow of a claim against the plaintiff.

It also appears that the logs from lot three were the first which were drawn to the creek behind the island near its mouth, and banked there. The defendants' witness, Mr. Pettibone, upon whose examination the information for the seizure was obtained, ascertained and testified that the logs from the government lands south of lot three were banked not on the creek, but on the bay. Having, as he swears he did, ascertained the amount cut there, there could have been no serious difficulty in selecting those logs. He seems to have had no such difficulty. As the evidence is not clear upon the locality of the rest, it may perhaps be assumed that the remaining logs from 141 trees from government lands were intermingled with those from the 327 trees from lot three. If lot three was government property, then no difficulty could arise, and Government would own all from the south half of the section. Being of opinion that the plaintiff's title had become established in that fraction, and could not be divested except by legal proceedings in behalf of the Government, I think that as to those two lots of logs there was an intermixture which would have rendered it impossible to identify one parcel from another. And, under all the circumstances, I think the plaintiff responsible for making it—so far as any responsibility or loss arises under such circumstances.

The question then arises, how far such liability goes. Where two kinds of articles are so mixed that they form a mass not like either, but differing in value or kind, the party not in fault, because he can not get back either his own property or that which will to all intents and purposes replace it, may, as has been held, retain the whole—although by the civil law there may be some doubt whether he was not obliged to account for the surplus value. But

where a mass of articles of a certain kind and value, as grain or the like, is mixed with another mass of the same kind and value, there is neither reason nor justice in hold-ing that any such forfeiture arises. A person is not damnified by mixing his property in a mass from which he can with-draw what will be substantially and to all intents and purposes identical with it. I do not think the decisions, when carefully weighed, maintain any such doctrine as would create a forfeiture in such a case. Where a man can obtain all that he is entitled to in order to put him in full enjoyment of his own, the law will not bestow on him the property of another.

That logs are to be governed by similar rules there can be no reason to doubt. We not only know as a matter of common information, but the evidence before us shows that logs situated as these were had a uniform value per thousand feet, taking them as they ran, and that one parcel was as good as another parcel. There may be differences between select and poor logs, but where it exists there is no great danger of such an intermixture as will prevent a party from reclaiming his own or its equivalent. In the case before us the testimony of value shows that no differ ence existed.

There was no reason therefore why the defendants should have seized more than what belonged to Govern-ment, the amount of which they had ascertained. They did not seize the logs for the purpose of selecting that amount. They seized the whole, claiming them as public property, and at once advertised them for sale, thus negativ-ing any idea of holding them for the other purpose. Such a seizure amounts to a conversion, and I think they should have been held liable accordingly. I think judgment should go in favor of the plaintiff for the value of 538 trees at four dollars a thousand (each tree averaging by the testimony at least a thousand feet), which would make the amount of his damages $2,152, to which interest should be added from May 12, 1857.

MARTIN CH. J. :

The fact that Stephenson cut a large portion[1] of the logs seized from lands belonging to the United States is not denied; and the right of the Government to reclaim such logs by seizure or by action is unquestionable. The defendants Little and Hess, as officers of Government, and acting under authority conferred by the proper department, made the seizure, and in so doing took logs cut from the plaintiff's own land, with which he had admixed them. That there was an actual and intended admixture I can not doubt. After the seizure and before sale, and while the logs lay as they were when seized, a storm scattered a portion of them so that they were lost, and the interest of the Government in only 1273 logs was consequently sold. The number of trees cut and removed from Government lands was about 678, which, according to the estimate of witnesses furnished about 1860 logs. Here then was a loss to the Government of some 600 logs, and to the plaintiff of all his thus intermixed and scattered.

Three questions are therefore raised. The first involves the right of the Government to make the seizure; the second, the consequences of such seizure, and the third the right of the defendants Little and Hess to make the same. It appears that the logs of both the plaintiff and the Government were commingled by the tortious act of the plaintiff. The subject of the confusion of goods was elaborately discussed by counsel, in the presentation of this case, but it does not appear to me to be necessarily involved. Here was a clearly tortious taking, and an admixture, which, whether by accident or by design, was of such a nature that the particular logs of either party could not be distinguished and separated from the mass. Under such circumstances Government, like an individual, had a right to take all, if not as its property by reason of the confusion of goods, at least for the purpose of separating and securing, or of disposing of its aliquot

proportion of the entire mass. Government had a clear and unquestionable property in at least, say 1850 or 1860 of the logs; and in taking the whole to secure that property, it committed no wrong upon the plaintiff, as it was by his own act that such taking became necessary. Such being the case, it follows that no accident to or destruction of the property while so held by the Government in the exercise of a legal right, if it occurred without its act or default, could subject the Government to liability for the loss, if the property actually sold did not exceed the amount tortiously taken. But the evidence fails to show that any actual manual interference with Stephenson's logs took place. Boutell's remark to Stephenson's agent that he was put in charge of the logs, and his forbidding him to have any thing further to do with them, proves nothing against Little and Hess, or even against himself. When and where it was made, under what circumstances, and upon what occasion or provocation, or whether he was really put in charge of the logs, is not shown by any testimony. His assertion, unless made upon the property, or so made as to import dominion over it, and actual possession of it, or accompanied by some act showing a claim to its possession, was no conversion by him, and certainly can not be construed as evidence of conversion by Little and Hess. There is nothing to show but that this was mere idle talk, and it did not of itself make him a trespasser, and could not unless he was in a position to sustain his claim, as by actual possession; and then could not in any way affect his co-defendants, as torts are personal.

If we take the notice of sale as evidence of conversion, we can not determine with any degree of certainty the number of logs taken, and it declares that all the logs which would be exposed for sale were cut upon government land, and were lying at the mouth of Potobaco Lake. This notice must be construed in the light of the

sale made under it. Such sale was of the interest of the Government in the logs; and such interest was bid in by the plaintiff, through Hart his agent. The fact that Hart afterwards sold them to Frazer does not, in my opinion, affect the question under consideration, or the rights of the parties to this suit. The single fact of importance is that the offer was only of the interest or property of the Government in the logs, and that the purchase was made of that interest by the agent of the plaintiff. There was never any exclusion by Little and Hess of the plaintiff from the possession of his property, and by this purchase he appears to have recognized an interest in the Government in the logs.

That the owner of goods wrongfully commingled by another with his own has the right to take possession of all, if he can do so without violence, to repossess himself of his own, as I have already said is unquestionable. It is a right founded in natural justice, and is a necessary and natural incident to property. If he has such right, it follows that he is not responsible to the party wrongfully intermingling, for any damage or loss of such property, unless wilfully done or occasioned by himself. It can scarcely be claimed that he stands in a less favorable position than that of a tenant in common towards his co-tenant, so far as this question of liability is concerned. From the very nature of things his liability should not be greater. Rather than establish a rule by which the party trespassed upon should suffer injury by peaceably reclaiming his property, because in thus reclaiming it some portion or all of the property of the wrong doer was taken, and afterwards lost or destroyed by the act of God, I would hold to the severest rule of confusion of goods, and protect the innocent party at the expense of the wrong doer. I can not question the right of the Government in this case to sell its interest in the mass; and as Hart for Stephenson bought such interest, Stephenson cannot insist upon a

conversion of any logs held under such seizure, or the Government's interest in which was thus exposed for sale; and as the quantity of logs sold was less than that wrongfully taken from government land, the whole loss must and should fall upon him. This is but simple justice, and would commend itself to any mind as a correct rule of property in such cases. Before a party who has thus admixed his goods with those wrongfully taken from another can maintain an action for his aliquot proportion, he must make a demand upon the party injured—and who has taken all to secure his own—for the portion belonging to himself, and he must distinguish his own property satisfactorily. This the plaintiff in this case did not do, but relied upon the seizure and sale as giving the right to this action.

Of the logs thus seized some 1,500 were taken from lot three; and these it is contended rightfully belonged to the plaintiff. In my view of the case this question is immaterial, as logs taken from other lands belonging to Government were admixed with them. But I am also clear that the plaintiff had no right to cut logs upon that lot; and consequently none to those cut thereon and mixed with others belonging to himself. The evidence shows that the title to such lot was then in the Government, and for aught that appears still is; and that no exchange of that lot for the south east quarter of the north west quarter of section thirty was ever made. The right of Stephenson to such exchange it is not necessary to discuss; but that his conduct was fraudulent, and the officers of the Government justifiable in refusing to make the exchange, I do not doubt. But he had no right to take the logs from the land before such exchange was made, whatever may have been his equitable rights to a specific performance of the contract.

The only remaining question is, whether the defendants Little and Hess had a right to seize the logs in question.

That Government, like an individual, has the right to seize and reclaim property tortiously taken, when such

seizure can be peaceably made, will not be questioned. But Government can only act through its departments, and by its officers, agents and servants. The instructions to Little and Hess from the Commissioner of the General Land office were in my view instructions from the Government, and fully authorized them to act in its behalf in repossessing its property. Moreover, Stephenson, as a wrong doer—especially in this action of trover, where he must rely upon his own title—cannot question the right of the Government to protect itself, or that of the officers or agents of the Government peaceably to reclaim its property.

The judgment must be affirmed, with costs.

*Judgment affirmed.*