CLAFLIN & COMPANY *et al. v.* THE CONTINENTAL JERSEY WORKS *et al.*

1. Where an agent's authority is conferred and defined in writing, the scope or extent of such authority is a question for determination by the court.

(a) It is not allowable, by the adduction of extrinsic oral evidence, to add to the powers expressly given in the writing; the authority must be proved by the instrument itself; especially where the power of attorney was relied upon throughout the whole transaction, the agent's acts believed to be within the letter of his authority, and the advice of counsel in reference thereto taken.

2. Creditors of the principal claiming that he obtained credit and bought goods from them upon the faith of certain representations made by him which afterwards proved to be false, and upon discovering the fraud having demanded of the agent a return of the goods thus procured, his authority was exceeded by delivering to them not only such as they could identify as having been sold by them, but others to make up the balance of their claims; the power of attorney conferring no authority to consent to the rescission of past sales to the principal in his absence and by reason of his fraud, and it being incompetent for the creditors to rescind the contract and at the same time to get a benefit under it.

3. The express purpose of the power of attorney being a continuation of the business during the principal's absence, though under it the agent was authorized to pay bills, he could not legally surrender a large part of the stock in trade in satisfaction of the demands of creditors to the full amount of their debts, which for the most part were immature. And while he was entrusted with the possession and management of the business, he could use the goods so as to realize some profit to his principal, but could not

pay even matured claims in goods discounted twenty-four per cent. from the cost price marked upon them by the principal.

(*a*) That an agent may take payment in property other than money gives no support to the contention that he may make payment in the same way without express authority; especially where his au thority is created by writing, which is subject to a strict construction.

(*b*) Such acts of the agent could not be justified on the ground of their being called for by an unforeseen emergency. Whoever deals with an agent with full notice of the extent of his authority, must determine at their own risk and peril whether particular acts are within that authority.

4. Where one fraudulently, wilfully or wrongfully mixes or confuses his goods with those of another and cannot distinguish his own, he will lose them; but where he does so innocently or by mistake, if he can distinguish them or show their value or their proportion of value to the whole, he ought in equity to be allowed to do so      The question is for the jury.

5. If the creditors taking the goods from the agent had elected to rescind the contract, but the election was, by mistake of law, improperly executed by them by the purchase in good faith of goods other than their own from the agent, to satisfy their claims, while they could not hold the goods so purchased, they would still have the equitable right to insist upon their election and claim their goods if they could be distinguished. If not, but they could show the exact proportion in money that their goods bore to those purchased, they would be entitled to that proportion; and if they could not show the exact proportion but only an estimated one, and if the estimates could be relied on with absolute certainty to the extent of considerably more than half, they would be entitled to at least half of the amount

6. Expressions by the court of opinion on the evidence, made while deciding questions of law in the case before the charge commences, are not expressions of opinion thereon in the charge.

July 12, 1890.

Principal and agent. Evidence. Contracts. Vendor and purchaser. Fraud. Rescission. Payment. Mingling goods. Equity. Practice. Before Judge FALLIGANT. Chatham superior court. June term, 1889.

The Continental Jersey Works and others, in behalf of themselves and all other creditors of David Weisbein as might be made parties complainant, filed their bill on January 4, 1888, against David Weisbein, Joseph Lichtenstein, H. B. Claflin Company and E. S. Jaf-

fray & Company, alleging as follows: Weisbein is a merchant trading in Savannah, and is indebted to orators certain large amounts for goods sold him, most of which amounts are past due. Within the past few days he has disappeared from Savannah, leaving his store in operation and apparently in charge of his clerks, and his whereabouts cannot be ascertained after searching inquiry. He is also indebted to others many thousands of dollars. Many attachments of different dates have been and are being issued and levied on his goods. His book accounts of large amounts are outstanding, and require immediate collection. He is utterly insolvent, his liabilities and assets being (to the best of orators' knowledge and belief) over seventy-five and under fifty thousand dollars respectively. In his absence it has been impossible to demand payment of him. Claflin & Co. and Jaffray & Co., of New York, claimed to be his creditors in large amounts; and since his absence, Lichtenstein, claiming to be his agent, has attempted to convey to those firms, through their attorneys, Garrard & Meldrim, goods of the value (as orators are informed) of $20,000 or more, of which goods those attorneys have assumed control and are removing them to various places in the city, intending (as orators believe) to send them out of the State. Lichtenstein had no power so to deliver these goods, which are being illegally converted by the firms named, to the damage of orators and the other creditors. Orators waive answer under oath, and pray for receiver, injunction, general relief and *subpœna*, that their claims against Weisbein may be established, and his estate equitably administered and distributed to his creditors.

A temporary restraining order and a rule *nisi* were granted, and a temporary receiver was appointed. On January 7, 1888, the complainants filed an amendment,

stating the respective amounts due each of them by
Weisbein for goods sold him, as per account shown to
the court, and alleging as follows : Said sales were fair
and proper on the part of orators, but they have re-
ceived no consideration for the goods. Weisbein was
insolvent when he purchased and did not intend to pay
for them, but concealed his insolvency and thus ob-
tained the goods by fraud. Complainants claim title
to them, and are entitled to their possession and pro-
ceeds as against all persons. About the times of pur-
chasing them, and for several months prior to the filing
of the bill, Weisbein bought largely from others on
credit, filling his store with new goods, and deliberately
and fraudulently accumulated, by December 25, 1887, a
large stock largely not paid for ; and from the proceeds
of heavy sales therefrom in the latter part of 1887, ac-
cumulated about $60,000 in cash, with which he ab-
sconded, and remains hiding from his creditors. About
December 23, 1887, before leaving, he executed a power
of attorney to Lichtenstein, his clerk, which instrument
is recorded. On December 31, 1887, Lichtenstein at-
tempted thereunder to prefer Claflin & Co. and Jaffray
& Co., who claimed to be creditors in about $14,000
and $3,000, by giving to their agent a bill of sale to
certain portions of the stock of the value of $18,000
and $4 000 respectively ; all of which was illegal and
without authority, the power of attorney being intended
simply to enable Lichtenstein to conduct the business
in the usual and ordinary manner. It was his duty, as
soon as he knew that Weisbein had absconded with
the intention to defraud his creditors, to hold the stock
for the common benefit of all concerned; his action
operated as a fraud upon orators ; and Claflin & Co.
and Jaffray & Co. legally acquired no preference. On
receiving the bills of sale, they had ample grounds for
reasonable suspicion that Lichtenstein, as agent of

Weisbein, intended to delay and defraud the other creditors, as he did. Orators are informed and believe that the firms named had, for some time previous to the absconding, reasonable grounds to suspect that Weisbein was in failing circumstances. On one or more occasions Claflin & Co. protected their paper on Weisbein. In so doing and in selling him large bills of goods on credit, they tended to inflate his credit as a solvent debtor in buying from other merchants, to extend the scope of his business, etc. The bills of sale are void as against orators. They cover in part goods sold by them to Weisbein, for which they have received no compensation. Since the date of the power of attorney, creditors of Weisbein have had many garnishments issued in suits against him, causing his credits to be tied up in the hands of many debtors. From the time he absconded to the 2d of January, 1888, Lichtenstein realized from sales of goods large sums, which are subject to orators' claims. They pray that he account therefor to the receiver, and be declared a trustee as to the same for the benefit of Weisbein's creditors, and account for his acts under the power of attorney; that the bills of sale be declared void; that the receiver keep the respective goods of complainants separate, and if sold, that the proceeds be applied to their claims, and if any balance due remains, that they have payment from the general assets; and that they have judgments against Weisbein.

On the same day, upon their petition, the court ordered that Claflin & Co. and Jaffray & Co. be allowed to ship the goods which had been turned over to them to New York, upon giving bonds in the sums of $30,-000 and $10,000 respectively, conditioned to pay whatever sums might be adjudged against them on the final decree in this case; and the bonds were given accordingly. Then they filed their answer to the following

effect: The bill shows on its face that complainants, as against these respondents, have a plain and complete remedy at common law, and as to them there is no equity in the bill. Respondents do not know what the respective assets and liabilities of Weisbein amount to. They do business and reside in New York City, have large amounts due them for goods sold to persons in Georgia, and have property in this jurisdiction subject to any claim or demand against them. They deny the material allegations of the bill. On December 31, 1887, Weisbein was indebted to Claflin & Co. $14,309.75, and to Jaffray & Co. $2,834.72; and the agent of Claflin & Co. called at Weisbein's store to obtain payment of about $3,000 then due, and was informed by Lichtenstein that he could not pay. Upon further inquiries, the agent became convinced that the statements made to his firm in and after July, 1887, by Weisbein, as to his ability and standing, upon the faith of which they sold him goods between July and the 24th of December, were false. The agent of Jaffray & Co. also became similarly convinced, the goods of that firm having been sold to Weisbein on almost identical representations. These two agents conferred, and demanded of Lichtenstein that the goods so sold by their firms be returned to them, and that immediate payment be made of whatever balance there might be due above the value of the goods so returned. Lichtenstein exhibited his power of attorney and declared that he was fully authorized to act for Weisbein; also that he would pay the entire debt but for not having the money and not being able to give security, and that he had nothing with which to pay save goods in the store. He then went with the two agents to the office of Garrard & Meldrim, where demands were again made on him for the goods and payment of the balance. He inquired of the attorneys if without money he could pay in goods; and was told

that he should return to those two firms their goods which were in stock, and pay the balance in goods at a fair valuation, properly inventoried, estimated, set apart and delivered. Lichtenstein said he would do it; and thereupon respondents' goods were sought out and inventoried, the prices being taken from the marks thereon, until they had got as far as possible all the goods they owned which remained in stock. They went through the same process to select enough of other goods to make up the balance; and the total amounting to something over $500 more than the value of the goods originally sold to Weisbein, this overplus was paid to Lichtenstein and paid out by him upon other debts of Weisbein. The delivery of the goods was completed, and respondents' agents took charge of them on the morning of January 2, 1888, intending to move them. Later in that day and afterwards, numerous attachments were levied on them, and respondents gave the usual forthcoming and damage bonds with the claims they interposed. To pack them properly they were removed to other places in the city. The object of shipment to New York was to obtain better prices, than could be obtained by forced sale in Savannah. The entire transaction in obtaining the return of the goods belonging to respondents and payment of the balance in other goods, was in good faith, as diligent creditors trying to get payment of honest debts at fair value, and was not to hinder, delay or defraud any other creditors, and was without any knowledge, belief or suspicion of any such intent on the part of Lichtenstein, or any reasonable cause for such suspicion. Respondents know nothing as to Weisbein's relations with other creditors, or concealing his insolvency, or buying goods not intending to pay for them, or how much stock he accumulated, or how much money he took off; nor, until lately, did they know anything of his buying

v 85-3

largely from other houses. They did not get the goods they received at a sacrifice; were not after a preference, but simply looking after their own interests; and having had goods taken from them by Weisbein's fraud, they rightly demanded and received so much of them as could be obtained, with payment of the balance in other goods, which was the only reparation they could get; after which they receipted Weisbein in full for their debts. They would not have sold him such large amounts if they had had reasonable grounds for suspicion that he was in failing circumstances. They had not such grounds; nor did they protect his paper or give him time thereon, nor do any other act tending to inflate his credit or extend the scope of his business, having no interest in him other than they had in their other debtors. They estimate that of the goods received back by Claflin & Co. fully two thirds were goods they had themselves sold; and of those received by Jaffray & Co. one half were goods that they had sold. The matters stated in the affidavits of Lichtenstein and Singleton (hereafter appearing) touching the transfer of the goods, are true. They did not know on December 31, 1887, that Weisbein had absconded or was concealing himself; one of their agents had talked with him in the store nine days before; they had no reason to suspect him, but believed he would return in a short time; etc.

Affidavits were made by Lichtenstein and by Singleton (another employee of Weisbein) corroborative of the material allegations of the answer just referred to; and Lichtenstein also filed an answer in which he adopted the allegations of his affidavit, among others. He stated that on December 23, 1887, Weisbein informed him that he was to be absent from Savannah for some time in attendance on a matter of business in which he was interested, touching the organization of a corporation in the north for control of an invention or

copyright, and wished deponent to take charge of the business during such absence. To this end he executed the power of attorney in question, which is attached. It is dated December 24, 1887, and recorded four days later. It recites that Weisbein is about to be absent, and for the interests of his business during such absence he appoints Lichtenstein his true and lawful attorney in fact, "with full, ample and complete authority as my said attorney to take charge of and control my said business . . to supervise, manage and control its various departments and appointments in their each and every particular; to buy and sell such goods and merchandise as may be necessary for said business and for its proper conduct and advancement; to collect all money or moneys due to me and give proper receipts and acquittances therefor, and to pay all bills due by me to others for goods, merchandise or otherwise; to sign and execute my name to all papers, drafts and documents; to employ such clerks, agents and servants as may be necessary and proper for said business, . . and all and any or further act or acts that may be necessary and proper for the furtherance and carrying out of the purposes, aims and objects of said business, in as complete, ample and full a manner as though I was personally present and as I could do myself; hereby ratifying, approving and confirming each, all and every act and thing my said attorney, during my absence from said city, may do or perform." Acting under this power and, as he thought, for the best, he acquiesced in the demands of Claflin & Co. and Jaffray & Co.; believing that if this indebtedness were adjusted, the other creditors would give him a breathing spell and he would be enabled to carry on the business and pay all of the creditors. He was not then aware of the large amount of indebtedness that now appears to have been due. He did not know or have reason to suspect the insol-

vency of Weisbein, and had no intention to hinder, delay or defraud creditors. He intended to continue the business. He had allowed a large sum due him for salary over a long period to accumulate in Weisbein's hands. He conducted the business up to January 2, 1888, and deposited the proceeds of sales in bank to Weisbein's credit; etc.

On June 30, 1888, verdict was rendered, finding in favor of the complainants against Weisbein, and that the allegations in the bill and its amendments were true, so far as they were charged against him; and a decree was entered in accordance therewith, adjudging further that all his assets be appropriated to his creditors who might be parties hereto, and be converted into cash and distributed to them, and that the receiver theretofore appointed be made permanent.

On January 14, 1889, Claflin & Co. and Jaffray & Co. amended their answer, making the following additional allegations: Up to July 1st, 1887, Weisbein had paid Jaffray & Co. for all goods theretofore purchased. He had been buying from them about ten years. At the time of his last purchase in September, 1887, aggregating $2,834.72, he induced the sale of that amount to him by false and fraudulent statements as to his financial condition, which were fully believed by Jaffray & Co. Having discovered their untruth a day or two before December 31, 1887, they demanded their goods on the ground that the title thereto had not passed, by reason of such deception. Claflin & Co. had been selling him goods for many years, extending as far back as 1871. Upon their request for information as to his status, made in January, 1887, he informed them in various particulars which were false, but upon which they relied in selling him goods from July 1, 1887, to January 1, 1888. After making the bonds required by the order of the court, respondents carefully packed

the goods they received of Lichtenstein, shipped them to New York and sold them to the best advantage possible, receiving for those delivered to Jaffray & Co. $1,400, and for those delivered to Claflin & Co. $13,053.15. At the time the bill was filed, Weisbein was not a trader, his stock being in charge of officers under numerous levies, and no trading being done by him. Respondents pray that they be protected by decree; that the reception by them of the goods they had of Lichtenstein be declared valid and confirmed; that the plaintiffs in the attachments be required to look to the fund for distribution in this case; that the bonds given be cancelled, etc. They say that if their claims be not sustained, they would be entitled, as creditors, to their proportion of the money realized from Weisbein's assets, and pray that they be allowed to participate in the distribution thereof.

On January 16, 1889, the cause came on to be heard. Under the evidence and the court's charge, the jury found in favor of the complainants against Claflin & Co. and Jaffray & Co. for $13,437.04 and $3,124.78 respectively. In accordance therewith, the court rendered a decree that they were liable for those sums with interest from January 18, 1888, and that they pay the same to the receiver, and also pay the costs incident to their claims and this trial. They moved for a new trial on the grounds mentioned in the opinion, among others. The motion was overruled, and exception was taken.

GARRARD & MELDRIM, for plaintiffs in error.

C. N. WEST, DENMARK & ADAMS, LAWTON & CUNNINGHAM, JACKSON & WHATLEY, A. C. WRIGHT, CHARLTON & MACKALL, LESTER & RAVENEL, A. MINIS, JR., J. M. GUERARD, W. P. LAROCHE, W. R. LEAKEN, M. A. O'BYRNE, U. H. McLAWS, G. W. OWENS, DUBIGNON & FRASER, H. E. WILSON and J. H. KEOGH, *contra*.

SIMMONS, Justice.

1. The errors assigned in the 5th to 18th (inclusive) grounds of the motion for a new trial go to the refusal of the court to give in charge to the jury certain principles of the law of agency which bear upon the question of the extent of Lichtenstein's authority. The requests may embody sound law; but it is immaterial whether they do or not. Where an agent's authority is conferred and defined in writing, the scope or extent of such authority is a question for determination by the court. Mechem on Agency, §104; 1 Thompson on Trials, §1370; Berwick *v.* Horsfall, 29 L. J. C. P. 193; *Dobbins* v. *Etowah, etc. Co.* 75 *Ga.* 238, 243; Pollock *v.* Cohen, 32 Ohio St. 514. As said by this court in the case above cited: "That it was the duty of the court to construe both the charter and the letter of attorney, and to determine the extent of power conferred by both and each of them upon the agent, we think is a plain proposition. Taken alone, and without proof of other circumstances to which it was necessary to resort to clear ambiguities or to explain doubtful intention, there was nothing for the jury to find. The question was purely and simply one of law, to which it was the exclusive right and duty of the judge to respond." In requesting charges upon the extent and nature of a general agency, there seems to have been an attempt by the plaintiffs in error to enlarge the authority of Lichtenstein beyond the limits of his power, or at least to establish the construction that the instrument created a general agency. If there was any such effort, the court did not err in defeating it. It is not allowable, by the adduction of extrinsic oral evidence, to add to the powers expressly given in the writing. The authority must be proved by the instrument itself. *Neal* v. *Patten*, 40 *Ga.* 363. The very purpose of a power of attorney is to prescribe and publish the limits within

which the agent shall act, so as not to leave him to the uncertainty of memory, and those who deal with him to the risk of misrepresentation or misconception as to the extent of his authority. To confer express authority is to withhold implied authority. There can be no parol enlargement of a written authority. Wharton on Agency, §225; Mechem on Agency, §306; Reese *v.* Medlock, 27 Tex. 120, s. c. 84 Am. Dec. 611; Batty *v.* Carswell, 1 Am. L. C. 687, notes; Pollock *v.* Cohen, 32 Ohio St. 514.

Besides, the power of attorney was relied upon throughout the whole transaction. The plaintiffs in error believed Lichtenstein's acts to be within the letter of his authority, having taken the advice of counsel in reference thereto, so that they cannot claim to have been misled by any appearance of authority other than that which the writing gives.

2. Did the court err in holding as matter of law that Lichstenstein exceeded his authority when he delivered the goods in dispute to the plaintiffs in error? We will look first at the character of that delivery. The contention of the plaintiffs in error is two-fold. They say, first, that Weisbein, the principal, obtained credit and bought goods from them upon the faith of certain representations made by him which afterwards proved to be false; that their agents, upon discovering the fraud, went to Lichtenstein and demanded a return of the goods thus fraudulently procured; that there were returned to them all the goods which they could identify as having been sold by them to Weisbein, and to make up the balance of their claims, other goods were delivered to them by Lichstentein; that of the goods taken by Claflin & Co. about two thirds had been identified as having come from that house, and of those taken by Jaffray & Co. about one half had come from the latter; and they now insist that, as to these por-

tions of the goods at least, they should not be held liable, because Weisbein's title to them was avoided *ab initio* by their rescission of the sale. There can be no doubt that the agent violated his duty in admitting, upon an *ex parte* representation, that his principal had committed such wholesale fraud, especially when he knew so little of the latter's concerns as to be totally surprised on hearing of the outstanding indebtedness, and when he professed to have the intention of continuing the business. An agent cannot deny his principal's title. Code, §2188. It cannot be said that the power of attorney was intended to or did confer the extraordinary authority of consenting to the rescission of past sales to the principal, in the latter's absence and by reason of his fraud. See Bradford *v.* Bush, 10 Ala. 386.

But it may be said that such consent was not necessary; that the defrauded vendors had the right to pursue and take their goods wherever they found them, notwithstanding it was the agent's duty, as custodian of the property, to maintain the possession thereof. There would be more force in this, if these creditors had proceeded as for their own goods alone. A party cannot renounce a contract and at the same time get a benefit under it. Thus the rescinder cannot sue, or take security, for the price, and at the same time follow the goods. Bank of Beloit *v.* Beale, 34 N. Y. 473; Cobb *v.* Hatfield, 46 N. Y. 533; Joslin *v.* Cowee, 52 N. Y. 90; Thurston *v.* Blanchard, 33 Am. Dec. 705, notes; Loyd *v.* Brewster, 4 Paige Ch. 537, s. c. 27 Am. Dec. 88, and notes; Grant *v.* Law, 29 Wisc. 99; Bridgeford & Co. *v.* Adams, 45 Ark. 136; 2 Parsons on Contracts, p. 813, 922, notes; 1 Benj. on Sales, p. 569, note; 2 Warvelle on Vendors, 878.

3. The second contention of the plaintiffs in error is, that if the attempted rescission was futile, still the

transfer of the goods to them by Lichtenstein was valid, because he had authority under the power of attorney to pay the debts of his principal, and, in lack of money, he could pay in goods. This payment theory is more consistent with the facts of the case than the other one of rescission. It is apparent from the answers that the first intention of the agents of the plaintiffs in error was to rescind the sales and simply retake their goods; but finding that this would leave a considerable balance of their claims undischarged, they acted as if the sales were to be confirmed, and demanded payment of both the matured and the maturing indebtedness therefor. Lichtenstein acceded to their demands, and in settlement with Claflin & Co. delivered to their agent goods aggregating about $14,000 in value, after making certain discounts amounting to 24 per cent. from the cost prices as marked on the goods by Weisbein. To the agent of Jaffray & Co. were given goods in value near $3,000, after making similar discounts amounting to 9 per cent. It does not appear how much, if any, of the indebtedness to Jaffray & Co. was matured at the time payment was demanded. But it does appear that of the indebtedness to Claflin & Co. only about $3,000 was then due, leaving about $11,000 on which the time of credit had not expired. It cannot well be disputed that Lichtenstein had no authority to anticipate and accelerate the payment of this $11,000, especially when he swears in his answer that he expected to continue the business. It is nowhere alleged that the amount owing to Jaffray & Co. was due, but all the circumstances indicate that it was not due, when Lichtenstein delivered the goods to their agent. This therefore was also an unauthorized payment. Beals v. Allen, 18 Johns. 363; Hampton v. Matthews, 14 Penn. St. 105. The writing in question expressly states its object to be a continuation of the business during the principal's

absence. Nothing could be more foreign to this object than to surrender a large part of the stock in trade at the demand of creditors whose debts were mostly immature. That was clearly against the interests of the business and in excess of the agent's authority.

But the acts of an agent are valid to the extent that they are within his authority. So the question arises whether the payment of some $3,000 of matured indebtedness to Claflin & Co. can be upheld. Lichtenstein was authorized "to collect all money or moneys due to me and give proper receipts and acquittances therefor, and to pay all bills due by me to others for goods, merchandise or otherwise." A formal power of attorney, being executed with deliberation, is subject to a strict construction. The general terms are restricted to consistency with the controlling purpose, and do not extend the authority beyond the special powers expressly delegated. Rossiter v. Rossiter, 8 Wend. 494, s. c. 24 Am. Dec. 62; Reese v. Medlock, 27 Tex. 120, s. c. 84 Am. Dec. 611; Holtsinger v. National Bank, 6 Abb. Pr. 292; Ferreira v. Depew, 17 How. Pr. 418; Hogg v. Snaith, 1 Taunt. 347; Atwood v. Munnings, 7 B. & C. 278; Esdaile v. LaNauze, 1 Y. & C. 394; North River Bank v. Aymar, 3 Hill, 262; Stainer v. Tyson, Id. 279; Batty v. Carswell, 1 Am. L. C. 687, notes; St. John v. Redmond, 9 Port. (Ala.) 428; Scarborough v. Reynolds, 12 Ala. 252; Dearing v. Lightfoot, 16 Ala. 29; Rogers v. Cruger, 7 Johns. 557; Delafield v. Illinois, 26 Wend. 192; Story on Agency, §§21, 62–68; Wharton on Agency, §222; Ewell's Evans on Agency, p. 204 et seq.; Mechem on Agency, §306; Verdell v. Ketchum, 52 Ga. 139; Pollock v. Cohen, 32 Ohio St. 514. Now the writing in the present case expressly states its object to be a continuation of the business during the principal's absence. Lichtenstein was entrusted with the possession and management of the

business for that purpose. This required him to take care of and not sacrifice the goods. His authority embraced using them so as to 'realize some profit to his principal, but not paying even 'matured claims in goods discounted 24 per cent. from the "cost price" marked upon them by the principal.

The word "pay" sometimes has a wide sense which includes payment in other things than money. Anderson's Dict'y Law, "Payment"; Foley *v.* Mason, 6 Md. 37. Yet it is believed that the ordinary meaning of the word in commercial usage is the more restricted one of payment in money. Parsons on Mercantile Law, p. 80. " The term payment, in its legal import, means the full satisfaction of a debt by money, not by an exchange or compromise, or an accord and satisfaction, and it is only where the words used in connection with it plainly manifest a different intention, that the legal import of the term can be rejected." Manice *v.* R. R., 3 Duer (N. Y.) 426. Besides the power here is not simply to pay claims or demands, but to pay *bills*. So, if it were to be conceded that the word "pay" is ambiguous, this can hardly be said of the expression "pay bills," which implies the use of money. Abbott's Law Dictionary, "Bill," III. The fact that the code, §2864, in treating of the law of payment, allows an agent to take payment in property other than money, gives no support to the contention that he can make payment in the same way, without express authority to do so. This forms an exception to the well-settled rule, that where an agent is given power in general terms to do an act, he is restricted in the manner of performing it to that which is usual in the course of business. Wiltshire *v.* Sims, 1 Camp. 258; Taylor *v.* Robinson, 14 Cal. 396; 2 Kent Com. p. 622; Story on Ag. Especially is this true of an authority created by writing where a strict interpretation is proper. If Weisbein had meant to

give Lichtenstein a power so exceptional, it is fair to suppose that he would have plainly so expressed himself in making a formal declaration of the limits within which the agent was to act.

But it is sought to justify the acts of Lichtenstein on the ground of their being called for by an unforeseen emergency, and the court was asked to charge the jury on that subject. There was no error in refusing so to do. The authorities cited on this point are wholly inapplicable to a case like the present. Most of them refer to the powers of the master of a ship in prosecuting a foreign voyage, where it becomes impossible to do the precise thing for which the voyage was undertaken. Moreover, in all these cases the question has come up as between principal and agent. The latter was allowed to defend on the ground that when it became impossible without his fault to perform the thing for which he was employed, and thereupon he in good faith did the best he could, he should not be held liable to the principal for failing to do exactly what was intended. The only case found which is at all like the present was where the general superintendent of a mining company, upon the business getting embarrassed, borrowed money of a bank and gave a mortgage on the products as security, in order to pay off warrants sued out by the employees for their wages. As between the principal and the bank, it was held that no such authority could be implied from the general powers of the agent, or be justified on the ground of necessity. Hawtyne *v.* Bourne, 7 M. & W. 595. Whoever deals with an agent with full notice of the extent of his authority must determine at their own risk and peril whether particular acts are within that authority. Stainback *v.* Read & Co., 11 Grat. 281, s. c. 62 Am. Dec. 648; Hodge *v.* Combs, 1 Black (66 U. S.), 192; Craighead *v.* Peterson, 72 N. Y. 279; Story on Agency, §72. And it does not

seem a harsh rule to require all transactions, whose effect is to give some creditors of an insolvent an unconscionable preference over the others, to keep within strict legal lines. "Equality is equity."

4. During the progress of the case the court held that, under the evidence submitted, "the case would fall within the operation of the principle that where a person mingles his goods with those of another, and is unable to distinguish them, the loss must fall upon him"; and refused to submit to the jury any other question than those of the value of the whole amount of goods taken by the plaintiffs in error from the store of Weisbein, and of whether interest should be allowed upon that amount or not. This was excepted to *pendente lite*, and is also assigned as error in the 30th ground of the motion for a new trial. We have collected numerous authorities upon the "mixing" or "confusion" of goods, and from them deduce the following propositions:

(1) Where one fraudulently, wilfully or wrongfully intermingles his goods with those of another, so that there is no evidence to distinguish the goods of the one from those of the other, he is guilty of a "confusion of goods," and forfeits all his interest in the mixture to the other party. Cooley on Torts, p. 56; Bigelow on Fraud, p. 575; Lawson Rights Rem. and Pr., vol. 3, p. 2396; Kent's Com., vol. 2, p. 364; Blackst. Com. vol. 2, p. 405; Story on Bailments, §40; Bishop on Non-Contr. Law, §938; The Idaho, 93 U. S. 575; Ward *v.* Ayre, Cro. Jac. 366, s. c. 2 Bulstr. 323; Anonymous, Popham, 38; Beach *v.* Schmultz, 20 Ill. 185; Root *v.* Bonnema, 22 Wisc. 539; Stephenson *v.* Little, 10 Mich. 433; Wingate *v.* Smith, 20 Me. 287; Adams *v.* Wildes, 107 Mass. 123; Willard *v.* Rice, 11 Metc. 493; Jewett *v.* Dringer, 30 N. J. Eq. 291; Diversey *v.* Johnson, 93 Ill. 547; Ryder *v.* Hathaway, 21 Pick. 298; 2 Schouler Pers. Prop. p. 41 *et seq.*; Loomis *v.* Greene, 7 Me. 325; Jenkins *v.* Steanka, 19 Wisc. 139. See Code, §3083.

In the case of agents, bailees, executors, administrators and other trustees, all of whom occupy a position of trust or confidence, the rule as to confusion will apply when the mixing is merely negligent or careless. Story on Agency, §205; Story on Bailments, §40; Lupton *v.* White, 15 Ves. 432; Schouler Pers. Prop. p. 46; Code, §2193. So of mortgagors entrusted with possession. 11 Metc. 493; 107 Mass. 123. So also of a guardian. *Hudson* v. *Hawkins,* 79 *Ga.* 274.

(2) Except as to agents, trustees, etc., as above mentioned, the rule will not apply unless the mixing was fraudulent, wrongful or wilful, which words as used by the authorities imply generally an improper motive or purpose. See text books above cited and the following cases: Spence *v.* Ins. Co., L. R. 3 C. P. 429 (accidental); Hesseltine *v.* Stockwell, 30 Me. 295; Thorne *v.* Colton, 27 Iowa, 425 (honest); Foster *v.* Warner, 49 Mich. 641 (regular course of business); Chandler *v.* DeGraff, 25 Minn. 88; Stone *v.* Quaal, 36 Minn. 46; Attorney-general *v.* Fullerton, 2 Ves. & Beames, 263.

(3) The rule will not apply when each owner can be given his identical property. Moore *v.* Bowman, 47 N. H. 494; Smith *v.* Sanborn, 6 Gray, 134; Hesseltine *v.* Stockwell, 30 Me. 237; Robinson *v.* Holt, 39 N. H. 557; Goff *v.* Brainerd, 58 Vt. 468; Alley *v.* Adams, 44 Ala. 609; Holbrook *v.* Hyde, 1 Vt. 286; Queen *v.* Wernwag, 97 N. C. 383; Colwill *v.* Reeves, 2 Camp. 575.

(4) The rule will not apply when the goods, though undistinguishable, are of equal and uniform value, that is, when the mixture is approximately homogeneous. In this case the remedy is division in kind of compensation for actual loss. Hesseltine *v.* Stockwell, 30 Me. 237; Robinson *v.* Holt, 39 N. H. 557; Wilson *v.* Nason, 4 Bosw. 155; Stone *v.* Quaal, 36 Minn. 46; Hart *v.* Ten Eyck, 2 Johns. Ch. 62, 108; Stephenson *v.* Little,

10 Mich. 433, dissenting opinion of Campbell, J.; Cooley on Torts, p. 58; McDonald *v.* Lane, 7 Can. S. C. 462; Attorney-general *v.* Fullerton, 2 Ves. & Beames, 263; Starr *v.* Winegar, 3 Hun, 491; May *v.* Bliss, 22 Vt. 477; Schulenberg *v.* Harriman; 21 Wall. 44, (law of Minn.)

It will be seen from these authorities that if one fraudulently, wilfully or wrongfully mixes or confuses his goods with those of another and cannot distinguish his own, he will lose them. If, however, he does it innocently or by mistake, the rule is different. If in such case he can distinguish them or can show their value or their proportion of value to the whole, he ought in equity to be allowed to do so. We think, therefore, that the court erred in not submitting to the jury whether these goods were mixed wilfully, fraudulently or wrongfully. If the jury had found that they were, then the principle announced by the court below would have applied. But if they had found that they were mixed innocently or by mistake, with no improper motive or purpose, then we do not think it would have applied, and the plaintiffs in error would have been entitled to retain the goods which they could distinguish, or the value thereof; or they would have been entitled to show, if they could by proper evidence, what proportion of value their goods bore to those purchased from Weisbein's agent.

5. The court also ruled that the right which the plaintiffs in error had to rescind the sale was lost by what in legal effect was an abandonment of their right of election; and this ruling was excepted to. We are inclined to think that the court went too far in this ruling. It seems to us, from a careful reading of the evidence in this record, that the plaintiffs in error had elected to rescind the contract, but that the election was, by mistake of law, improperly executed by them in the

purchase of other goods than their own from Weisbein's agent to satisfy their claims. We think, therefore, this question also should have been submitted to the jury, and the jury left to say whether or not they elected to rescind, and if so, whether or not they abandoned that election and made a purchase of the goods, and if not abandoned, whether the election was improperly executed by mistake, and if improperly executed, whether it was done by mistake and in good faith. Did they at the time really believe that they were carrying out the rescission of the contract? We are inclined to think that if they elected to rescind the contract, and in good faith purchased the goods from Weisbein's agent, while they could not hold the goods so purchased, they would still have the right in equity to insist upon their election and claim their goods if they could be distinguished, or such a fair proportion of the goods as they might by evidence show they were entitled to. If, under the law, they were entitled to rescind the contract, and the goods were sold, and they could show by proper evidence the exact proportion in money that their goods bore to those purchased, in our opinion they would be entitled to that proportion. If they could not show the exact proportion, but only an estimated one, and if the estimates could be relied upon with absolute certainty to the extent of considerably more than half, we think they would be entitled to at least half of the amount. This rule would apply to Claflin & Co., because the record shows that the estimate of their goods was seventy-five per cent. of the whole. The estimate of Jaffray & Co. was not so large, and therefore they would not be entitled to recover so large a proportion as Claflin & Co. upon a mere estimate.

6. There are other errors complained of in the motion for a new trial, but we deem it unnecessary to discuss them, as the questions made therein will not likely arise

on the next trial. Many of these grounds complain that the judge in his charge to the jury expressed an opinion upon the evidence. The expressions complained of were not made while charging the jury, but in deciding the questions of law in the case before the charge commenced.          *Judgment reversed.*